John TURNER, Individually and d/b/a Bahama Bronze Enterprises, a proprietorship and Riviera Cosmetics, Inc., Plaintiffs-Appellants,

v.

GREAT AMERICAN OPPORTUNITIES, INC., d/b/a Southwestern Educational Marketing Services Company, a/d/b/a Nashville Educational Marketing Services, Defendants-Appellees.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

June 18, 1986.

Application for Permission to Appeal
Denied by Supreme Court
Sept. 2, 1986.

Edward P. Silva, Hartzog, Harris & Silva, Franklin, for plaintiffs-appellants.

Charles H. Warfield, H. Naill Falls, Jr., Rachel L. Steele, Farris, Warfield & Kanaday, Nashville, for defendants-appellees.

## OPINION

TODD, Presiding Judge, Middle Section.

The plaintiffs, John Turner, d/b/a Bahama Bronze Enterprises, and Riviera Cosmetics, Inc., have appealed from a directed verdict and judgment dismissing their suit against the defendant, Great American Opportunities, Inc., d/d/a Southwestern Educational Marketing Services Company, a/d/b/a Nashville Educational Marketing Services for trade mark infringement and misappropriation of trade secrets.

The sole issue presented on appeal is:

Whether the trial court erred in granting to defendants, at the conclusion of plaintiffs' proof, a directed verdict *with regard to the cause of action alleging a misappropriation by defendants of plaintiffs' trade secrets.* (Emphasis supplied.)

It should first be noted that there are two plaintiffs, John Turner and his corporation, Riviera Cosmetics, Inc. It is alleged in the amended complaint that John Turner assigned to Riviera "his proprietary rights to the product", but no allegation is found that the title to any trade secrets were transferred to the corporation. Neither brief makes any specific distinction between the joint plaintiffs, and none will be made by this Court.

As to the "defendants", there is only one defendant, Great American Opportunities, Inc. The other "defendants" are mere trade names under which the defendant is alleged to have operated.

There is evidence from which a jury might find the following:

Plaintiff, Turner, received certain training in pharmacology by employment with three pharmaceutical companies. Thereafter he compounded several suntan lotions by mixing same at his home and testing

them upon neighborhood children; he did not make a secret of the ingredients, but the proportion of ingredients and the manner of mixing was kept secret. When the product was perfected, he located the following "suppliers" for manufacturing and marketing the product as follows:

Valjean, a "filler" to "blend the products".

Braun Bottle Company to supply bottles.

Sequist and PVC to supply caps.

Tape and Label to supply labels.

A Winter Park, Fla. firm to supply boxes.

In October, 1979, Turner began to negotiate with defendant regarding the marketing of his product. Turner's corporation, Riviera, proposed to sell the product to defendant at 98 cents per bottle with payment assured by letter of credit to enable financing of large volume manufacture. Defendant declined to furnish a letter of credit, but agreed to pay suppliers direct if furnished with their names and addresses. Turner disclosed to defendant the names of the suppliers. On January 25, 1980, defendant wrote plaintiffs a letter a copy of which was signed and returned to defendant. The text of the letter was as follows:

Enclosed is our Purchase Order for 100,000 bottles of Polynesian Tan. I would like to summarize the various points which we have agreed upon in placing this order.

1. Riviera Cosmetics agrees not to offer this product to any other fund-raising organization that would interfere and compete with the purposes of the agreement with Riviera and NEMS.

2. Riviera Cosmetics will provide product liability insurance on Polynesian Tan.

3. Riviera Cosmetics will pick up any legal costs in a product liability suit against Nashville EMS due to any irritating or abnormal reactions which might occur that are not normal with the use of products of this nature. Riviera Cosmetics is not liable for results of any product misrepresentation by Nashville EMS.

4. Riviera Cosmetics also agrees to trade the four product types in order to obtain a balanced inventory if one particular product is moving more than another.

5. Nashville EMS has the option to renew this relationship under the same terms next year, excluding product cost.

John, if all of these conditions meet your approval, I would like for you to acknowledge them by signing a copy of this letter for our files.

Thereafter, during 1980, defendant purchased 320,000 bottles of plaintiffs' product without controversy.

When the parties negotiated the contract for 1981, defendant informed Turner that defendant could obtain equivalent products from the same suppliers. Nevertheless, the parties agreed upon a continuation of their relations during 1981. A written contract was executed by Riviera and defendant on December 22, 1980.

WHEREAS, Riviera developed and owns the formula for a line of suntan products which it markets and sells under its registered trademark POLYNESIAN TAN (R), including, Golden Tanning Lotion, Dark Bronze Tanning Lotion, Dark Bronze Tanning Oil, Super Tanning Oil and After Sun Lotion (hereinafter referred to as the "Suntan Products").

WHEREAS, the Suntan Products are manufactured for Riviera by Valjean Corporation, 1785 South Patrick Drive, Indian Harbor Beach, Florida 32937 ("Valjean") and/or other manufacturers specified by Riviera.

WHEREAS, NEMS desires to continue to be the exclusive distributor of the Suntan Products through fund-raising organizations and through mail order sales, and Riviera desires to appoint NEMS as such exclusive distributor.

NOW THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements hereinafter set forth, NEMS and Riviera hereby agree as follows:

1. During the term of this Agreement, Riviera (a) appoints NEMS to be the exclusive distributor of the Suntan Products in the United States through fund-raising organizations and through mail order sales, and (b) agrees not to sell any of the Suntan Products in the United States through fund-raising organizations or through mail order sales or to sell any of the Suntan Products to any other corporation, business entity or person which will sell any of the Suntan Products in the United States through fund-raising organizations or through mail order sales.

2. The term of this Agreement shall be the period commencing January 1, 1981 and terminating October 30, 1981, unless terminated sooner as provided herein.

3. During the term of this Agreement, Riviera grants NEMS a non-exclusive license to use any trademark, trade name, formula, process or other proprietary right owned by Riviera with respect to the Suntan Products in connection with NEMS's advertising and sale of the Suntan Products....

4. NEMS shall place all orders for the production of the Suntan Products directly with Valjean or other manufacturers and with the suppliers of the containers and labels for the Suntan Products (NEMS to use manufacturers and suppliers as specified by Riviera if their price and the quality of their performance is, in the judgement of NEMS, competitive) and shall pay all such suppliers directly. Riviera shall cooperate with NEMS and assist NEMS to the best of its ability, in arranging for the production of the Suntan Products.

5. In consideration for the rights herein granted by Riviera to NEMS, including the license provided for in Paragraph 3 hereof, NEMS shall pay to Riviera a consideration of $.05 for each unit of the Suntan Products received for sale by NEMS. NEMS shall pay such royalty within 7 days of receipt of shipment to NEMS warehouse in Franklin, Tennessee. There shall be no deduction for returns of the Suntan Products unless by fault of Riviera or manufacturers.

. . . .

8. During the term of this Agreement, NEMS agrees not to act as a distributor for, or to sell, suntan products other than the Suntan Products sold by Riviera.

. . . .

10. NEMS shall have the right to renew this agreement for an additional 1-year term, on the same terms and conditions provided that NEMS pays Riviera a consideration on a minimum of 200,000 units of the Suntan Products during 1981 and provided that NEMS gives Riviera notice by October 1, 1981, that NEMS is exercising its option and renewing this agreement for an additional 1-year term, with a minimum order of 200,000 units.

. . . .

At some time in 1982, Valjean, one of the suppliers above mentioned, began to manufacture for defendant a suntan lotion which was a "counterfeit" of plaintiff's product. At the same time, defendant ordered bottles, labels and caps from suppliers listed above.

No evidence is cited or found that defendant ever sold any of the "counterfeit" product during the term of its written agreement, quoted above.

Valjean participated in the development of the formula of plaintiffs' suntan lotion and that of defendants' lotion, and Valjean claims that the proprietary rights to both formulae belong to it.

Ingredients of suntan lotions are not secret, for they are listed on the label of the product.

The brief of appellant states:

The trade secrets Turner claims NEMS to have misappropriated to their own use are of two categories. First, was the information concerning the suppliers of the component parts of the Polynesian Tan products which Turner revealed to NEMS during the course of a confidential business relationship. Second, was

the formulas for those products created by Turner and revealed to Valjean for the purpose of the latter manufacturing those products for Turner, also a confidential business relationship.

It appears from the preceding quotation that the information as to suppliers was furnished by plaintiffs to defendant, but that the information as to formula was furnished to Valjean. No evidence is cited or found that either plaintiff conveyed to defendant in confidence the exact proportion of ingredients and/or any particular order, procedure or process for combining the ingredients.

While there is evidence that Turner "developed" the formula, that he imparted it to Valjean for purposes of manufacture, and that he otherwise preserved its secrecy, the action of Turner in turning the formula over to Valjean to use and further refine without warnings or contractual assurances of its secrecy negatives any status of trade secret for the formula.

If the request had been to manufacture a product from plaintiffs' formula, a better argument could be made for misappropriation, but this is not shown by the evidence. The uncontroverted evidence is that most suntan lotions contain the same ingredients and that any skilled formulator is able to duplicate with reasonable accuracy any such product on the market.

Appellant asks this Court to infer that the order to produce a product "as near as possible" to that of plaintiffs was in fact an order to misuse the formula of plaintiffs. In the light of the uncontradicted evidence of the broad formulation experience of Valjean, such an inference is not permissible.

Appellant cites *Hickory Specialities, Inc. v. B & L Laboratories, Inc.,* Tenn. App. 1979, 592 SW2d 583, which was a suit by a manufacturer to enjoin a former employee from using a process, learned while in the employ of plaintiff for the manufacture of "liquid smoke", a flavoring agent for meat. It was shown that "liquid smoke" was produced by four manufacturers in the United States, that each manufacturer used a distinctive process, that defendant knew nothing about manufacturing liquid smoke until employed by plaintiff, that he learned the process while employed by plaintiff, that he made numerous photographs, sketches and notes of the manufacturing process which he intended to use in producing a competitive product, and that the processes of plaintiff were unique in the industry.

No such situation is presented by the present record. No unique process or formula is shown. The general procedure, ingredients, and equipment for manufacturing plaintiffs' suntan lotion are not shown to be unique, and there is no showing that the precise methods or formula used by Valjean in manufacturing plaintiffs' product were used in manufacturing defendants' product.

Appellants cite *College Watercolor Group, Inc. v. William H. Newbavor, Inc.,* 468 Pa. 103, 360 A2d 200 (1976), but that case involved a larceny by fraud or trick and misuse of the fruits of the fraud. Such elements are not present in the present case wherein no fraud or trickery is shown.

There is no evidence of any effort by plaintiffs to safeguard the secrecy of their formula or process, such as a contract with Valjean, defendant or anyone else requiring the preservation of such secrecy. There is no evidence of any relationship of employer and employee or other relationship from which a duty of confidentiality would be inferred. The relation shown in this record originated as a seller-buyer relation and evolved into a licensor-licensee agreement. The contract mentions the right to use a formula or process during the term of the contract, but does not mention secrecy.

Even if it be said that the contractual license to use a formula or process for the term of the contract implied a covenant not to use the formula or process after the expiration of the term of the contract, this would not establish plaintiffs' right of action where the formula or process was not shown to be unique in the industry, and

where there is no showing that the identical formula was used. The record shows that Valjean knew and used many similar formulae and processes for manufacture of suntan lotions, and there was nothing unique about the formula and process used in the manufacture of plaintiffs' product.

In *United States Plywood Corp. v. General Plywood Corp.* 6th CCA 1966, 370 F2d 500, cert. den., 389 U.S. 820, 88 S.Ct. 42, 19 L.Ed.2d 71 (1966), the plaintiff sought to enjoin the use of a process by defendant to whom the process was revealed in an effort to negotiate a licensing agreement. The Court held that the "eager revelations of a prospective licensor to a prospective licensee" without an express agreement for confidentiality destroyed any actionable "misappropriation of trade secret".

So, in the present case, the voluntary disclosure to Valjean and/or defendant of any alleged "trade secret" as a part of a business transaction without any reservation or agreement of confidentiality prevents the recognition of the information as a "trade secret". See *Kodekey Electronics, Inc. v. Mechanex Corp.* 10 CCA, 486 F.2d 449; *Allis Chalmers Mfg. Co. v. Continental Aviation and Engineering Corp.* E.D. Mich. 255 F.Sup. 645; *Ellicot Machine Corp. v. Wiley Mfg. Co.* DC Md. 1969, 297 F.Supp. 1044.

No evidence is found in this record to support a verdict against defendant for misappropriation of formula or process.

What has been said about the alleged misuse of information about formula or process is applicable with even greater force to the other theory stated by plaintiffs regarding names of suppliers. The record does not show any secrecy about this information as to the identity and location of tradesmen in the open market. There is no evidence that such information was not readily available otherwise than from plaintiffs or that any agreement, reservation or mention of secrecy attended the communication of the information.

In the light of the foregoing, it is deemed unnecessary to examine other defenses presented by defendant. However, it may be observed that no evidence is found to support an assessment of damages, even if liability should be found.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against appellants. The cause is remanded for such further proceedings, if any, as may be necessary and proper.

Affirmed and remanded.

CANTRELL and KOCH, JJ., concur.