896 F.Supp. 751 (1995)
TGC CORPORATION, Plaintiff,
v.
HTM SPORTS, B.V., a Netherlands Corporation, d/b/a Head Golf, Division of HTM Sports, B.V., and Head Sports, Inc., a Delaware Corporation, d/b/a Head Golf, Defendants.
No. 1:92-cv-593.
United States District Court, E.D. Tennessee.
April 25, 1995.
*752 *753 Andy D. Lewis, Chattanooga, TN, for plaintiff.
Shelby R. Grubbs, C. Crews Townsend, Chattanooga, TN, for defendants.

MEMORANDUM
EDGAR, District Judge.

I.
This case went to trial on two causes of action. The first cause of action is the claim of plaintiff TGC Corporation ("TGC") that defendants Head Sports, Inc. and HTM Sports, B.V. ("Head") breached a letter agreement between the parties dated November 8, 1990. The second cause of action is TGC's state tort claim that Head misappropriated trade secrets. Both claims were tried together.
The contract cause of action was reserved for decision by the Court without a jury. The Court's decision on this claim is embodied in a memorandum opinion filed on March 22, 1995, resulting in a judgment against Head in the amount of $222,647.85 on the contract claim. The trade secrets misappropriation claim, however, was tried to a jury with the result being a verdict against Head for $475,000 in compensatory damages, $24,938 in prejudgment interest, and $1,230,000 in punitive damages, a total of $1,729,938. The Court's decision on TGC's contract claim and the jury's verdict are both embodied in a judgment entered on March 22, 1995, in the total amount of $1,952,585.85.
This case is now before the Court on Head's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 on TGC's trade secrets misappropriation claim and to amend the judgment pursuant to Fed. R.Civ.P. 52 on TGC's breach of contract claim. In the alternative, Head moves for a new trial under Fed.R.Civ.P. 59. (Court File No. 128).

II.
The standard for considering a motion for judgment as a matter of law under Fed.R.Civ.P. 50 in diversity cases is the state standard for a directed verdict. Arms v. State Farm Fire and Casualty Co., 731 F.2d 1245, 1248 (6th Cir.1984). That standard in Tennessee requires the trial court to:
[T]ake the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be draw [sic] from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.
Id. (quoting Holmes v. Wilson, 551 S.W.2d 682, 685 (Tenn.1977)).
Fed.R.Civ.P. 52 governs the procedures relating to claims tried without a jury or with an advisory jury. Under Rule 52(b), a party *754 may move the Court to amend its findings or make additional findings and to amend the judgment accordingly. A motion to amend under Rule 52(b) may be made along with a motion for a new trial pursuant to Fed. R.Civ.P. 59. Id.
The standard for considering a Fed.R.Civ.P. 59 motion for a new trial in diversity cases is a federal standard. Davis v. Jellico Community Hosp. Inc., 912 F.2d 129, 137 (6th Cir.1990); Arms, 731 F.2d at 1248 n. 2. With respect to claims tried before a jury, the Court may grant a new trial where it is convinced that the verdict is against the clear weight of the evidence. Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). With respect to claims tried before the Court, the Court may grant a new trial where it concludes that it has made a "`manifest error of law or mistake of fact'" and that "`substantial reasons'" exist for setting aside the judgment. Hager v. Paul Revere Life Ins. Co., 489 F.Supp. 317, 321 (E.D.Tenn.1977) (quoting CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2804, at 37 (1973)).

III.
The procedural history of this case is important. TGC filed this case on December 18, 1992, as strictly a contract suit against Head on the November 8, 1990 licensing agreement. On January 12, 1994, TGC was permitted to amend its complaint to add additional causes of action. These included (insofar as the Court was able to decipher them) (1) unfair competition by "misappropriation of trade secrets"; (2) fraud and deceit in the misappropriation of trade secrets; and (3) unfair competition and "trademark infringement by marking and/or styling unlicensed products in such a manner as to create confusion or the likelihood thereof in the minds of consumers." The Court has considered this third claim as one asserting that Head infringed TGC's trademark and "trade dress." On December 8, 1994, the complaint was again amended to seek injunctive relief.
On June 27, 1994, the Court, on Head's motion for summary judgment, dismissed what amounted to TGC's claims for trademark and trade dress infringement along with certain other claims. The trade dress claim was dismissed on the ground that the purported features of the golf and racquetball glove designed by George T. Tepley and George L. Tepley of TGC were functional and thus not entitled to trade dress protection. (Court File Nos. 69, 70); see Esercizio v. Roberts, 944 F.2d 1235, 1239 (6th Cir. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). Remaining in the case were plaintiff's claims for (1) breach of contract, and (2) misappropriation of trade secrets.

IV.
Taking the strongest legitimate view of the evidence in favor of TGC, what follows is a chronology of the facts in this case as they relate particularly to TGC's trade secrets misappropriation claim. This factual recitation will have a different focus than the findings of fact which this Court has already made in connection with TGC's breach of contract claim, but will of necessity duplicate those findings in some respects. The Court's findings on the contract claim are set forth in the Court's memorandum opinion of March 22, 1995 (Court File No. 126).
George L. Tepley worked for many years for C.D. Genter Company ("C.D. Genter") (now GenCo), a small company in Chattanooga, Tennessee that makes, and has long made, various types of work gloves. These gloves have a "seamless palm" in that, unlike some other glove designs, there are no seams in the palm of the glove where the thumb is sewn to the palm. These work gloves have a "gunn cut," which can be observed in a seam that cuts across the palm side of the base of the middle and ring fingers. All fingers are sewn together with just one seam and two pieces of leather (front and back).
In 1988, George L. Tepley was issued U.S. Patent No. 4,751,750 for a "working-hand glove." In 1989, Mr. Tepley, along with his son, George T. Tepley, a golf enthusiast, was issued U.S. Patent No. 4,850,053, also a patent for a working-hand glove. The workinghand *755 glove was described in the most recent patent as follows:
The glove of the invention is a particularly well-fitting working-hand glove which conforms closely to the natural shape of the hand in action, allowing the hand to be comfortably moved, without the restraint and tension found in the constricting designs of the past, and greatly reduces binding and interference from excess folds of leather. The glove fits closely, is ventilated for comfort, and provides good wear characteristics due to the designed elimination of tension when covering the hand at workwhether such effort is expended on the sports field, golf course, behind the wheel of a car, the factory floor, or any other use.
The glove is essentially the seamless-palm, gunn-cut design, which has been used to make work gloves for many years, adapted for use as a sports glove, such as a golf or racquetball glove. The feature that is seen to be the most advantageous about this glove, used as a sports glove, is that it has a seamless palm. By eliminating seams from the palm, perspiration is "wicked" away to other parts of the glove where there are seams that attract the perspiration. The palm, therefore, stays dry. This has been referred to as the "wick effect." Head was particularly attracted by this feature, and used the name "Dry 5" to market the glove.
TGC and employees of C.D. Genter worked on the design of this glove at the C.D. Genter manufacturing plant. For purposes of the Rule 50 motion, the Court must assume that the Tepleys invented the working-hand glove. There is, however, considerable evidence that the glove was in fact designed by another long-term employee of C.D. Genter, Mr. D.L. Fitzsimmons. The pattern which Mr. Fitzsimmons testified that he made (Defendants' Exhibit 113) is identical to the pattern that TGC says is used for its glove (Defendants' Exhibit 73(a)) and to the pattern that appears in TGC's Patent No. 4,850,053 (Plaintiff's Exhibit 4). In any event, whether or not Mr. Fitzsimmons designed the TGC glove it is clear that he most certainly knew how to put it together. The glove, or at least prototypes thereof, were manufactured by Fitzsimmons and C.D. Genter for TGC.
TGC also developed a computer-based system for custom fitting gloves which it patented and copyrighted (U.S. Patent No. 4,897,924 and U.S. Copyright No. TXU 355,830). TGC began a small manufacturing operation in Chattanooga where it made some golf gloves. TGC also had its golf glove made in the Phillipines by a firm called Bataan Leather. Although George Tepley[1] testified that he had confidentiality agreements with C.D. Genter and Bataan Leather, he is unable to produce any such agreements. There is no testimony by anyone else that such agreements existed. For purposes of the Rule 50 motion, the Court must consider that these agreements did exist. For purposes of the Rule 59 motion, however, any conclusion that TGC had trade secret confidentiality agreements with either of these firms is against the clear weight of the evidence.
TGC was never profitable. In fact it was losing a great deal of money when George Tepley in 1990 interested Head in the TGC glove. After several months of discussion it was contemplated that TGC would manufacture golf gloves for Head and that Head would market them. TGC contemplated that the glove would be manufactured "primarily, if not exclusively in Korea and [would] be made under the direction and supervision of TGC, and in accordance with TGC's design and quality criteria." (Defendants' Exhibit 13). Stephen Tepley, George Tepley's brother and the former president of TGC, said in a September 7, 1990 letter to Head that:
The standard size gloves will feature TGC's patented WORKING HAND® construction and all custom gloves will be made using TGC's patented hand scale and custom glove fitting system.
(Defendants' Exhibit 13).
Since TGC was not able to manufacture the gloves itself, it proceeded to have them made in Korea. TGC went about this by entering into an agreement with RLB Companies ("RLB") which were operated by a Mr. Robert Bowers. RLB was a kind of *756 broker which had business relationships with some Korean glove manufacturers. Through RLB, a Korean firm named Wohneel made gloves with Lycra® on the back of the hand  in particular, racquetball gloves and a "junior" golf glove. Another Korean firm, Hyunso, was to make the all-leather golf gloves. TGC gave RLB all the necessary information to manufacture the TGC glove. RLB refused to enter a written confidentiality agreement with TGC. RLB did, however, orally agree that it would use "reasonable caution" to protect the TGC glove design. (Tr. 688).
At this point, late autumn 1990, it was learned by TGC that the Korean manufacturers would not begin to manufacture gloves unless they were protected by a letter of credit to guarantee payment. Since TGC was manifestly not able to provide letters of credit, Head was obliged to do it. The business arrangement was then changed to make Head the "manufacturer," even though it knew nothing about manufacturing gloves. This arrangement was memorialized in the November 8, 1990 letter agreement which is the subject of TGC's breach of contract cause of action. In reality, TGC (specifically in the form of George Tepley) was the person to whom both RLB and Head looked for glove manufacturing expertise. While most of the discussions between TGC and Head had revolved around the all-leather, high-quality golf glove, the November 8th agreement also included racquetball gloves. The November 8, 1990 letter agreement with Head included a provision requiring Head to keep confidential the information, including "know-how" provided to Head regarding TGC's glove.
George Tepley went to Korea in January 1991 to show Hyunso how to make the all-leather golf glove. Suffice it to say that a number of problems developed and that Hyunso was never able to make the TGC glove properly. The gloves manufactured by Hyunso either had defective leather, or tore apart at the seams. There were also a few problems with the racquetball gloves, particularly the sizing. However, RLB and Wohneel were able to successfully manufacture the Lycra®-backed racquetball and junior golf gloves.
In the summer of 1991, George Tepley concluded that another Korean firm should be used to make the golf gloves. He suggested that the golf gloves be manufactured by Crown Global, Inc., another Korean firm, headed up by a Mr. Ted Park. In the summer of 1991 George Tepley, Dr. Matthews (a principal of TGC) and Butch Fick of Head met with Mr. Park in Atlanta, Georgia and Chattanooga, Tennessee. Tepley gave Mr. Park the necessary information to manufacture the TGC glove.
Park made changes in the TGC design. He eliminated the "gunn cut" and changed the pattern for the shape of the thumb. Later, in the spring of 1992, he designed further changes to the glove. These changes were:
(1) The two middle fingers were to be made with four pieces of leather (rather than two). This produced a three-dimensional finger. These extra pieces are called "fourchettes" or "gussets."
(2) Small triangular holes were placed between the fingers (like a glove manufactured by Footjoy) to help the glove breathe.
(3) A cuff and colors were added for style.
The glove designed by Park had nine pieces. These same changes were also designed by Park into the racquetball glove. While Park was making these changes, he was urged by Head to copy (and presumably did copy) the racquetball gloves previously made by RLB and Wohneel by using the same kind of Lycra® which had been used in those gloves.
After Tepley got Crown Global (Park) involved, he dropped out of the picture and was no longer involved in the glove manufacturing process. TGC became economically defunct sometime in 1991. In 1994, Head, which by this time was being run by different people, changed manufacturers again to another Korean firm, Imex. Head has continued to make seamless-palm golf and racquetball gloves through Imex.

V.
To be successful on its misappropriation of trade secrets claim, TGC must establish four elements:

*757 (1) The existence of trade secret;
(2) Communication of the trade secret to Head while Head was in a position of trust and confidence;
(3) Use of the trade secret by Head; and
(4) Resulting detriment to TGC.
Intera Co., Ltd. v. Dow Corning Corp., No. 92-6324, 1994 WL 69582, at *3 (6th Cir. Mar. 7, 1994); Hickory Specialties, Inc. v. B & L Lab., 592 S.W.2d 583, 586 (Tenn.Ct.App.1979) (citing Smith v. Dravo Corp., 203 F.2d 369, 373 (7th Cir.1953)).
The evidence which the Court and a jury has heard over the course of six rancorous days, allowing all reasonable inferences in TGC's favor, does not support the jury's determination that Head misappropriated trade secrets.

A. The Existence of a Trade Secret
The first element of a trade secrets misappropriation claim is, understandably enough, that there must be a trade secret. The Court inquired of TGC's chief witness, George Tepley, as to what he claims as trade secrets on behalf of TGC. (Tr. 243). Tepley, with prompting from counsel, then enumerated the claimed trade secrets. The Court will discuss each of these seriatim.

(1) The Seamless Palm (Wick Effect)
Many gloves have a semi-circular seam sewn in the palm where the thumb is attached to the palm side of the glove. TGC's working-hand glove has no such seam. The TGC glove is a "seamless-palm" glove which is comprised of a pattern of five pieces sewn together with a "gunn cut" and with single seams around the fingers. The "gunn cut" results in a seam sewn on the palm side at the base of the second and third fingers.
The seamless-palm feature of the TGC glove is clearly not a trade secret. It is disclosed in both of TGC's working-hand glove patents. (U.S. Patent No. 4,850,053  Plaintiff's Exhibit 4) (U.S. Patent No. 4,751,750 Defendants' Exhibit 2). In fact, a seamless-palm glove which uses a five-piece pattern nearly identical to that of TGC's glove was patented by one L.M. Thurlow effective in 1948. (U.S. Patent No. 2,576,349 Defendants' Exhibit 4). Anything that is disclosed in a patent is public knowledge and cannot be claimed as a trade secret. Coenco, Inc. v. Coenco Sales, Inc., 940 F.2d 1176, 1179 & n. 3 (8th Cir.1991); Rototron Corp. v. Lake Shore Burial Vault Co., 712 F.2d 1214, 1215 (7th Cir.1983); Arco Indus. Corp. v. Chemcast Corp., 633 F.2d 435, 443 (6th Cir.1980); ROBERT M. MILGRAM, MILGRAM ON TRADE SECRETS § 8.02[2], at 8-8 (1994). Additionally, seamless-palm gloves in this design have been made for many years by C.D. Genter (now GenCo Corp.) and by others as work, garden, and driving gloves. (Defendants' Exhibits 71A, 109, 110, 111); (Tr. 536).
TGC claims, however, that it was the first to use the seamless-palm design in a golf glove or a racquetball glove. Viewing the evidence most favorably to TGC, this is true. This, however, does not make the seamless palm a trade secret. Both of TGC's patents claim that the TGC design may be used on the "sports field," including a "golf course." Moreover, "`[s]imply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret.'" Computer Care v. Service Sys. Enters., Inc., 982 F.2d 1063, 1073 (7th Cir.1992) (quoting Service Ctrs. of Chicago, Inc. v. Minogue, 180 Ill. App.3d 447, 129 Ill.Dec. 367, 372, 535 N.E.2d 1132, 1137 (1989)). The application to golf and sports gloves of public information regarding the fashioning of seamless-palm, gunn-cut-designed gloves is not a trade secret. Yet it seems evident that the jury in this case thought that it was. When asked to determine which of Head's gloves incorporated a TGC trade secret, the jury found that all of the Head gloves which had a seamless palm did incorporate a TGC trade secret; while those Head gloves which did not have a seamless palm did not, according to the jury, incorporate a TGC trade secret.
The claimed benefit of the seamless palm in a golf or other sports application is that it draws moisture (perspiration) from the palm area to other parts of the glove where the seams are located. (Tr. 13). This presumably allows a better grip of a golf glove or *758 racquet. It is this particular feature that attracted Head as being marketable. (Tr. 387). As recited above, Head devised the trademark, "Dry 5," to market the glove.
The "wick effect" is not, however, a trade secret. If it exists, it is nothing that one has to know in order to make the glove. It is merely a by-product of the seamless palm, which by-product was used by both TGC and Head to market the glove. The "wik effect" (slightly different spelling, but phonetically identical to "wick") was advertised by TGC in its glove packaging, long before Head came into the picture, as a feature of the glove which produced "a smooth inside design and dry palm area." (Plaintiff's Exhibit 208).

(2) Thumb Stretch
As related above, TGC, in designing its glove, took the seamless-palm, gunn-cut design that had theretofore been used mostly for work gloves  gloves that did not need to fit closely  and used that design to make golf and racquetball gloves. George Tepley's father had worked for C.D. Genter for many years and was doubtless familiar with the seamless-palm, gunn-cut design. Golf and other sports gloves are made with thinner leather than are work gloves. TGC says that if its all-leather golf glove is not manufactured in a certain "secret" way, the thumb utilizing the thinner leather would stretch out of shape when the glove is taken off the hand. (Tr. 60-61). This would occur if the leather were sewn so that the leather on both the front and back of the thumb stretched toward the top of the thumb. According to TGC, the secret in making the seamless-palm, gunn-cut, all-leather golf glove is to sew a leather "back piece" on the thumb that stretches at a right angle to the stretch of the leather on the front of the thumb. (Tr. 60-62). This will hold the thumb in check. Leather stretches in only one direction (from side to side with the belly of the animal). (Tr. 59).
Was the technique of sewing a counterstretch back piece on the back of the thumb known only to TGC? For purposes of the Rule 50 motion, the Court must say yes. However, for purposes of the Rule 59 new trial motion, such a conclusion would be against the clear weight of the evidence. The TGC patents clearly disclose the necessity of a "back thumb piece," and the patents disclose in detail how that piece is to be sewn to the back hand side of the thumb. George Tepley testified in several instances that the thumb-sewing secret was not disclosed in the patents. (Tr. 62-243). He also testified that it was patented. (Tr. 242). While the patents do not specifically mention the stretch of the leather, one might well conclude that disclosure of the "back thumb piece," which disclosure is indeed made in the patents, in effect discloses the need for the counterstretch because, as Mr. Tepley testified, "[e]very good cutter knows [the] stretch of leather." (Tr. 59).
Furthermore, the thumb stretch cannot be a trade secret if it lacks novelty and is generally known in the trade. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 475-76, 94 S.Ct. 1879, 1883-84, 40 L.Ed.2d 315, 322-323 (1974). It must have some originality to be protectable. Phillips v. Frey, 20 F.3d 623, 628 (5th Cir.1994); Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1178 (2d Cir.1993). Mr. D.L. Fitzsimmons of C.D. Genter, who has been designing gloves for many years more than George Tepley, and who testified that he (not Tepley) designed the TGC glove,[2] also testified that any skilled glove maker would know how to cut the pattern to allow for the stretch of the leather on the back of the thumb. (Tr. 547-48). Ted Park knew about the thumb-stretch "secret" as well. (Tr. 579).
Finally, if the thumb-stretch "secret" was known only to TGC in 1990, it certainly is no longer a secret. Nike® has been making a seamless-palm, all-leather golf glove since 1992 or 1993. (Tr. 586) (Defendants' Exhibit 66A). Reebok® markets a seamless-palm batting glove (Defendants' Exhibit 70B) and a seamless-palm racquetball glove. (Defendants' *759 Exhibit 107). Each of these Reebok® gloves uses leather for most of the thumb.
As stated above, however, in evaluating Head's Rule 50 motion, this Court must consider that TGC has shown that it alone knew of the method of sewing the thumb back piece to produce counterstretch. Legal principles must, therefore, be applied to this set of facts. One can look at TGC's glove and readily observe how the thumb back piece is sewn. It is not disputed that glove makers know about the stretch of leather. If a physical feature of a product can readily be observed, if it may be easily ascertained or duplicated, it is not a trade secret. Hickory Specialties, 592 S.W.2d at 587; see Turner v. Great Am. Opportunities, Inc., 716 S.W.2d 40, 43 (Tenn.Ct.App.1986); Computer Care, 982 F.2d at 1072; Picker Int'l, Inc. v. Parten, 935 F.2d 257, 264 (11th Cir.1991); Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp., 255 F.Supp. 645, 653 (E.D.Mich.1966); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. f (1995). At best, TGC's purported method of sewing the back of the thumb is something that was produced through its ingenuity and effort. This, however, does not make it a trade secret. Even if no one had ever sewn a thumb like this before, it is not a secret because it is readily observable and ascertainable on the face of TGC's glove.
TGC points out that Hickory Specialties, Inc. v. B & L Lab., Inc., 592 S.W.2d 583 (Tenn.Ct.App.1979), states, "The fact that the secret could have been discovered by the defendant, through his own skills and initiative, is not determinative. The issue is whether the information was actually procured through a confidential relationship." Id. at 586. This language, however, does not contradict the rule that information readily ascertainable cannot be a trade secret, a rule that Hickory Specialties also cites. See id. at 587. The language cited by TGC presupposes the existence of a trade secret. Information readily observable or ascertainable, such as TGC's procedure of sewing the thumb back piece to produce counterstretch, cannot be a trade secret. It does not take any amount of "reverse engineering" to see how to sew a leather back piece on the TGC glove.
The thumb-stretch sewing procedure obviously only applies to gloves that have thumbs made entirely of leather. Only one of the gloves found by the jury to incorporate a TGC trade secret has an all-leather thumb. This is the Ted Park designed golf glove (Defendants' Exhibit 65). The remaining six gloves found by the jury to be offending have thumbs made of leather on the front, but have "back-thumb pieces" made of Lycra®, a synthetic product made by DuPont. Lycra® stretches four ways (Tr. 737) and does not pull out of shape as does leather. Obviously, the jury could not have under any circumstances properly found that the gloves with Lycra® backing on the thumbs incorporate the leather counterstretch thumb procedure.

(3) Sizing
TGC claims that certain "sizing specifications," which were developed by TGC using an "autocad" computer program and which program TGC claims is patented (U.S. Patent No. 4,897,924) and copyrighted (Copyright No. TXU 355,830), are trade secrets. Taking TGC's position at face value, the sizing patterns are the product of a patented and copyrighted process. The process itself is, therefore, in the public domain and cannot be a trade secret. Coenco, 940 F.2d at 1179; Arco, 633 F.2d at 443.
While Head could have produced glove patterns using the TGC glove-sizing process pursuant to the November 8, 1990 Head letter agreement, and without using a trade secret, Head did not do so. Instead, what TGC claims is that Head wrongfully used the patterns produced by that process to size its gloves. (Tr. 327). Actually, the claim is that Head used dies manufactured by TGC to cut pieces for gloves  somewhat akin to cutting cookies for baking.
As will be pointed out below, the evidence taken most favorably to TGC makes it clear that there were problems with, and that Head never used, some of TGC's sizing. Assuming, however, for purposes of this portion of the opinion that Head did use the sizing, it is clear that the size of a glove *760 cannot be a trade secret. Matters disclosed by a marketable product cannot be a secret. Hickory Specialties, 592 S.W.2d at 587. Anyone can simply look at the size of a glove and duplicate it. If a product may be duplicated with reasonable accuracy, it is not a trade secret. Turner, 716 S.W.2d at 43.
In sum, TGC's sizing patterns are not a trade secret because (a) they could be produced using information publicly disclosed in a patent and copyright, and because (b) they can be determined by merely looking at the gloves.

(4) Thinness of the Leather
Obviously, the thin leather used in TGC's golf glove is readily apparent for all to see. It cannot be a trade secret. Hickory Specialties, 592 S.W.2d at 587. The kind of leather used in the TGC glove was commonly used and known to any glove maker in the world. (Tr. 60).

(5) Lycra®
TGC claims that a particular type of Lycra® made with DuPont No. 6 yarn is a protectable trade secret. Lycra® is a product that is manufactured and sold by DuPont. Its presence on golf and racquetball gloves is obvious and cannot be a trade secret. Hickory Specialties, 592 S.W.2d at 587. It is not a "formula, process, pattern, device, or compilation of information." Id. at 586. Lycra® is widely used in constructing gloves for use in sports. (Tr. 506); (Defendants' Exhibits 107, 108). There is no secret to using Lycra® in gloves. If there is a secret about making Lycra®, it belongs to DuPont, not TGC.

(6) Velcro®
The use of Velcro® is not only obvious from the product and widely used in gloves and clothing of all types, but is disclosed in TGC's patents. Velcro® is not a trade secret.

(7) Stitching, Thread, Location of Elastic
TGC claims that the location of elastic inside the glove, the type of stitching ("lock" stitching with a set number of stitches per inch), and the use of nylon-core, wrapped thread are trade secrets. Clearly these are matters that are observable on the product and not secrets. For Rule 59 purposes, the clear weight of the evidence is that none of this was ever intended to be secret. George Tepley testified on one occasion that TGC itself used sewing tolerances from different sources (Tr. 184); that the glove was sewn together in the same fashion as any seamstress would normally sew a glove (Tr. 183); and "a glove is a glove is a glove." (Tr. 183).

(8) Combination of Components
TGC claims that its method of putting all of the above items together, like the recipe for baking a cake, is a trade secret. (Tr. 247). At one point George Tepley said that when all of this is put together, it becomes "our product, our patent, our technology." (Tr. 184). Of course, to the extent that the combination is TGC's patent, it is public information.
It is possible that a secret combination of known components or procedures can be entitled to trade secret protection. Arco, 633 F.2d at 442. Taking TGC's evidence at face value for Rule 50 purposes, its seamless-palm, all-leather golf glove was indeed new.[3] Was it secret? No. The only thing about TGC's glove-making process that approaches being secret or novel is the thumb counterstretch procedure. This would be applicable in only one of the seven Head gloves that the jury found to be offending. Moreover, for the reasons set forth above, the thumb counterstretch procedure cannot, taking the strongest legitimate view of the evidence in favor of TGC, be considered a trade secret.
As the Court noted above, the clear weight of the evidence is that TGC did not have confidential agreements with either Bataan Leather or with C.D. Genter. Yet, TGC *761 gave both those firms the necessary information with which to make the TGC glove. The voluntary disclosure of "any alleged `trade secret' as part of a business transaction without any reservation or agreement of confidentiality prevents recognition of the information as a `trade secret.'" Turner, 716 S.W.2d at 44. This, in itself, warrants a new trial under Fed.R.Civ.P. 59 on TGC's trade secret claim.

B. Communication of the Trade Secret to Head While Head Was in a Position of Trust and Confidence
This is not an issue in this case except, of course, to the extent that it requires the existence of a trade secret. Whatever information TGC gave to Head, it did so under the November 8, 1990 letter agreement, which information Head agreed to keep confidential.

C. Use of the Trade Secret by Head
The jury found that the following gloves incorporated a TGC trade secret:
Ted Park Designed Leather Golf Glove (Defendants' Exhibit 65)
Ted Park Designed Junior Golf Glove (Plaintiff's Exhibit 190)
Ted Park Designed Sensation Racquetball Glove (Plaintiff's Exhibit 178)
Ted Park Designed Maverick Racquetball Glove (Plaintiff's Exhibit 180)
Ted Park Designed Conquest Racquetball Glove (Plaintiff's Exhibit 182)
Imex Manufactured Conquest Racquetball Glove (Plaintiff's Exhibit 192)
Imex Manufactured Sensation Racquetball Glove (Plaintiff's Exhibit 193)
The jury found that the following gloves did not incorporate a TGC trade secret:
Imex Manufactured Maverick Racquetball Glove (Plaintiff's Exhibit 194)
Imex Manufactured Radical Racquetball Glove (Plaintiff's Exhibit 195)
Imex Manufactured Webb Racquetball Glove (Plaintiff's Exhibit 196)
Do any of the seven gloves that the jury found to be offending utilize a TGC trade secret? Since, as discussed above, the evidence does not support a conclusion that TGC's glove manufacturing process or any components of the glove are protectable trade secrets, the answer must be no. As pointed out above, the feature that all of the "offending" gloves have in common is the seamless palm. The seamless palm, as already explained, is manifestly not a trade secret. Moreover, only the Ted Park Leather Golf Glove (Defendants' Exhibit 65) employs the thumb counterstretch procedure deemed by TGC to be secret and not disclosed in its patents. For the reasons set forth above, that procedure is not a trade secret.
Even if one were to consider the TGC design to be a trade secret, for purposes of Fed.R.Civ.P. 59 the clear weight of the evidence is that Ted Park changed the design of the all-leather golf glove substantially. His nine-piece, nongunn-cut design (Defendants' Exhibit 65) is clearly put together very differently from TGC's five-piece, gunn-cut glove. Finally, there is no evidence that Imex, which manufactures for Head two of the racquetball gloves found by the jury to be offending, ever obtained any of TGC's glove-making recipe from TGC, Head, or from any other source. These two gloves (Plaintiff's Exhibits 192 and 193) are indeed seamless-palm racquetball gloves, not unlike one that is manufactured by Reebok® (Defendants' Exhibit 107).
In particular, it is clear that, to the extent TGC claims that sizing is a trade secret, sizing was never used in its entirety by Head. When RLB found that a "medium" was not really a medium, it changed the dies. (Tr. 649-50); (Tr. 365); (Tr. 213). When Crown Global (Ted Park) began making gloves from a different pattern, the cutting dies were of necessity changed completely. (Tr. 593).

D. Resulting Detriment to TGC
The jury awarded both compensatory and punitive damages to TGC. The compensatory damages were essentially based upon a reasonable royalty for gloves manufactured by Head after August 20, 1992 (the termination *762 date of the November 8, 1990 letter agreement).[4]
What is the nature of the harm that gave rise to these damages? George Tepley explained it this way:
THE COURT: Well, just explain how this has harmed you here. Let's get right to it.
THE WITNESS: I cannot conscientiously license it out with a copycat product out there that looks like our product, that is similar to our products, that does not work as well as our product, because of the seams and the fingers that creates the sweat. So what we were forced to do is to bring it to a court of law and to get a ruling where we could go and conscientiously sell a product to someone else the same way we did with Head. And this has cost us over two years.
(Tr. 179). TGC's essential complaint is that Head has been manufacturing a "copycat" glove and thus is preventing TGC from licensing its patent rights.
This claim demonstrates that what we really have here is a trade dress infringement case masquerading as a trade secrets case. Earlier in the case, TGC did make an "unfair competition" claim which the Court understood to be essentially a claim for trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Court (Court File No. 70) granted summary judgment to Head on this claim. The Court's rationale was that the trade dress feature that TGC claimed to have been infringed  specifically the seamless palm that purportedly wicks away moisture from the palm  is functional and thereby not protectable as trade dress. (Court File No. 69); see Esercizio v. Roberts, 944 F.2d 1235, 1246 (6th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992).
Because this case did not go to trial on a trade dress infringement theory, the merits of such a theory need not be discussed extensively here. The Court would note, however, that to be ultimately successful on a trade dress claim TGC must prove that:
(1) TGC's trade dress is distinctive, which distinctiveness must be either
(a) inherent distinctiveness, or
(b) acquired distinctiveness (secondary meaning);
(2) The appropriated features of TGC's trade dress are primarily nonfunctional; and
(3) The TGC trade dress used by Head is likely to cause consumer confusion. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, ___, 112 S.Ct. 2753, 2757-58, 120 L.Ed.2d 615, 624 (1992); Esercizio, 944 F.2d at 1239.
It is evident from the evidence now before the Court in this case that the seamless-palm golf glove, if it ever was inherently distinctive, is no longer distinctive  and this through no action of Head. Nike® makes such a glove, and other manufacturers make sports gloves with seamless palms. Certainly, since TGC made only a limited number of these gloves, no secondary meaning can be shown.
Moreover, a product's configuration is not protected, and therefore may be copied, if that configuration is functional. The purpose here is to prevent a perpetual monopoly from being granted to unpatented features. Qualitex Co. v. Jacobson Prod. Co., ___ U.S. ___, ___-___, 115 S.Ct. 1300, 1302-05, 131 L.Ed.2d 248, 252-56 (1995); Esercizio, 944 F.2d at 1246; Keene Corp. v. Paraflex Indus., Inc., 653 F.2d 822, 824 (3d Cir.1981). It has been said that, "[i]n general terms, a product feature is functional if it is essential to the use or purpose of the article, or if it affects the cost or quality of the article." Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606, 613 n. 10 (1982); accord Esercizio, 944 F.2d at 1246. It has also been said that a product is functional (and not protected) if its design, "is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." Two Pesos, *763 505 U.S. at ___-___, 112 S.Ct. at 2760, 120 L.Ed.2d at 627-28 (citing Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d 417, 429 (5th Cir.1984)). Suffice it to say that the Court's original decision on TGC's trade dress claim was correct. TGC's glove design would qualify as functional under either of the above definitions. The same policy reason behind the trade dress functionality requirement  the need to avoid unduly restricting competition would also apply to TGC's trade secrets claim, especially in view of the other similar products in the market which have not been shown to be "copycat" TGC gloves. In sum, if any detriment accrued to TGC, it was based on its "copycat" or trade dress claim. That claim, as the Court has already held, is not a sustainable claim under the facts and was not before the jury.
For the reasons discussed herein, an order will enter pursuant to Fed.R.Civ.P. 50 granting defendant Head's motion for judgment as a matter of law on TGC's trade secrets claim. In the alternative, and in accordance with Fed.R.Civ.P. 50(c), defendant Head's Fed. R.Civ.P. 59 motion for a new trial will be conditionally granted on TGC's trade secrets claim.

VI.
Head also moves for an amended judgment and for a new trial on TGC's breach of contract claim. Head does not dispute this Court's findings of fact, but asserts that the Court's interpretation of those facts was in error because the facts show that TGC prevented Head from performing, and further, there was a failure of consideration. These matters were fully addressed in the Court's March 22, 1995 memorandum. Head's assertions warrant neither an amended judgment nor a new trial on the contract claim.
An appropriate judgment will enter.

JUDGMENT AND ORDER
In accordance with the Court's memorandum filed herewith, the Court ORDERS AND ADJUDGES as follows:
(1) The defendants' motion (Court File No. 128) pursuant to Fed.R.Civ.P. 50 for judgment as a matter of law on the plaintiff's misappropriation of trade secrets claim is GRANTED, and judgment is hereby entered for the defendants on that claim. The plaintiff shall take nothing on that claim, and the plaintiff's misappropriation of trade secrets claim is DISMISSED on the merits.
(2) The defendants' motion (Court File No. 128) pursuant to Fed.R.Civ.P. 52 to amend the judgment on the plaintiff's breach of contract claim is DENIED.
(3) In accordance with Fed.R.Civ.P. 50(c), the defendants' motion (Court File No. 128), to the extent that it seeks a new trial under Fed.R.Civ.P. 59, is CONDITIONALLY GRANTED insofar as it pertains to the plaintiff's misappropriation of trade secrets claim, but is DENIED insofar as it pertains to the plaintiff's breach of contract claim.
The result of this determination by the Court is that a judgment in the plaintiff's favor and against the defendants remains outstanding in the amount of $222,647.85.
SO ORDERED.
NOTES
[1] George T. Tepley. His father, George L. Tepley, died in 1990.
[2] It is noteworthy, as stated above, that the five-piece glove pattern (Defendants' Exhibit 113), which Mr. Fitzsimmons designed, matches up with TGC's five-piece pattern (Defendants' Exhibit 73).
[3] It is no longer new, because at least one other manufacturer, Nike®, (Defendants' Exhibit 66A) is marketing such a glove.
[4] This date had previously been determined by the Court (Court File No. 61) in ruling on cross motions for summary judgment.