**RAINBOW NAILS ENTERPRISES, INC., Plaintiff,**

v.

**MAYBELLINE, INC., Maybelline Sales, Inc., Cosmair, Inc., Tevco, Inc., Jane Doe and John Doe, unidentified individual co-conspirators, and XYZ Corporation, an unidentified corporate co-conspirator, Defendants.**

No. 99–70079.

United States District Court,
E.D. Michigan,
Southern Division.

April 12, 2000.

Andrew W. Mychalowych, Farmington Hills, MI, for plaintiff.

Daniel J. Stephenson, Detroit Mi, Rock A. Wood, Grand Rapids, MI, Karen B. Benjamin, Bloomfield Hills, MI, for defendants.

## OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

On December 9, 1998, Plaintiff Rainbow Nails Enterprises, Inc., a Michigan corporation, brought this suit against Defendants in Oakland County Circuit Court, State of Michigan, asserting claims of breach of contract, fraud, misappropriation of trade secrets, and civil conspiracy arising from Defendants' alleged misappropriation of·fingernail polish technology allegedly developed by Plaintiff. Defendants removed the case to this Court on January 11, 1999, citing complete diversity of citizenship among the parties. *See* 28 U.S.C. §§ 1332(a), 1441(a).

By motions filed on September 30, 1999, both Plaintiff and Defendants seek an award of summary judgment in their favor. The parties responded to these cross-motions on December 2, 1999, and filed replies in support of their respective motions on December 20, 1999. In addition, the Court permitted the parties to file supplemental briefs regarding these cross-motions on March 1, 2000. Finally, on March 23, 2000, the Court conducted a hearing on the parties' motions.

Having reviewed the voluminous briefs and exhibits filed by the parties in support of their motions, as well as the other materials in the record, and having heard and considered the arguments of counsel at the March 23 hearing, the Court is now prepared to rule on the cross-motions for summary judgment. For the reasons set forth below, the Court finds that Defendants are entitled to summary judgment in their favor.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. The Parties to This Action

Although the parties have been largely unable to conform their filings to the page limits set forth in the Local Rules of this District, and have inundated the Court with exhibits in support of their motions,[1] the facts of this case are not terribly complex, and are in all material respects undisputed. Plaintiff Rainbow Nails Enterprises is a Michigan corporation established in the early 1990s by its principal and sole employee, Ted Jacob, as a vehicle to market Mr. Jacob's concepts and products in the fingernail polish industry. Although Plaintiff worked on various products within this industry, the technology at issue in this case relates to "the introduction and application of metal flakes into nail polish." (Complaint at ¶ 7.) According to Plaintiff, this approach causes nail polish to dry more quickly, primarily through a process known as "leafing." In particular, the metal flakes "leaf," or assume a flattened orientation, thereby holding open the surface of the applied nail polish and allowing the solvents to escape at a faster rate. (Jacob Dep. at 102.)

Defendants Maybelline, Maybelline Sales, and Cosmair[2] together are a well-

1. While the parties were given leave to file overlength briefs on several occasions, the Court is inclined to believe that the parties took undue advantage of the considerable latitude they were given. In particular, in their efforts to create the illusion of compliance with the Local Rules, the parties' counsel engaged in a number of questionable practices, including: (1) filing separate motions addressing only certain counts of Plaintiff's Complaint (see Tevco's separate motions for summary judgment on (a) Counts III, IV, VI, and VIII, and (b) Counts V and VII of the Complaint); (2) adjusting the line spacing and margins of their briefs (a frequent tactic, but see especially Plaintiff's Supplemental Brief); and (3) placing legal arguments in their exhibits (see Tevco's Reply Brief, Ex. F, and its Supplemental Brief, Exs. E and F). On December 6, 1999, the commentary to Local Rule 7.1 of this District was amended to emphasize that the Rule's 20–page limit "will be strictly enforced," and that "[a]ttempts to circumvent the Local Rule in any way may be considered an abusive practice which may result in the motion or response being stricken as well as sanctions being imposed." Counsel are cautioned to bear this in mind in their future filings.

   In addition, the Court is concerned by the frequency with which the parties and their counsel fail to identify any record support for the factual assertions in their briefs. On still other occasions, they engage in debates on such irrelevant subjects as the educational backgrounds of the parties' employees, and make arguments or assertions that are entirely repetitive of those contained in prior briefs. Absent these unnecessary and unwarranted excesses, the parties' briefs could have readily complied with the Local Rules. While the Court recognizes counsel's desire to "set the record straight," this effort is not aided in the least by repetitive arguments, unsupported assertions, or mere rhetoric. Rather, this Court is confident of its own ability to review the record, disregard unsubstantiated claims, and discount counsel's attempts at "spin."

   Further, the Court wishes to express its disapproval of the extent to which the parties have designated materials as "confidential" and filed them under seal. Ours is an "open judicial system," and there is a "strong common law presumption in favor of public access to court proceedings and records." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179–80 (6th Cir.1983). Among the materials filed under seal in this case are (a) (several copies of) a 1988 brochure from non-party Avery Dennison describing its off-the-shelf aluminum dispersion products, (b) photocopies of labels of nail polishes sold to the public by Maybelline and others, (c) letters exchanged among counsel during this litigation, and (d) agreements, correspondence and notes prepared by and exchanged among the parties between 1992 and 1994, none of which remotely disclose any purported trade secrets. Indeed, any trade secret justification for the parties' substantial filings under seal is open to question, where Plaintiff alleges that its trade secrets developed in the early 1990s have been misappropriated and incorporated into Defendants' publicly available and, in some cases, patented products. Given this wide availability of products allegedly incorporating Plaintiff's technology, and given the public nature of patents, any trade secrets surely have been disclosed by now, and face no additional threat from open access to the record in this case.

2. In 1996, Defendant Cosmair purchased Defendants Maybelline and Maybelline Sales.

known presence in the cosmetics industry. Maybelline holds two patents on a quick-drying nail polish formula marketed under the product name "Express Finish." However, Maybelline and its competitors in the nail polish business—including such firms as Pavion Ltd., Orly International, and Revlon—do not themselves manufacture the nail polish sold under their respective names. Instead, these companies rely largely on a handful of manufacturers, including Defendant Tevco, to make their products. Although Tevco was at one time a significant manufacturer of Maybelline products, Maybelline currently relies almost exclusively on one of Tevco's competitors, Kirker Chemical, as its nail polish manufacturer. In particular, Kirker, and not Tevco, manufactures Maybelline's "Express Finish" line of nail polish.

## B. Plaintiff's Business Relationship with Avery Dennison

In early 1992, Plaintiff began experimenting with nail polish formulas that included small, flat metal flakes with an approximate size of 10 to 20 microns. During this same time period, Plaintiff also was working with "thermochromic" nail polish formulas, which are designed to change colors in response to temperature changes. Only the "metal flake" technology, however, is at issue in this suit, and Plaintiff has neither alleged nor offered evidence that Defendants misappropriated any thermochromic technology.

In order to obtain metal flakes of the desired size and shape, Plaintiff contacted Avery Dennison, a company that manufactures aluminum dispersions under the brand name "Metalure." According to a company brochure, "Metalure dispersions are supplied as a slurry of aluminum platelets having a controlled particle size, dispersed in various solvents," and are designed "for use in printing inks, coatings and paints." (Plaintiff's Response to Maybelline's Motion, Ex. 5.) This brochure further indicates that the particle size of the aluminum platelets found in Metalure products ranges from 3.6 to 45.3 microns. (*Id.*)

It is not clear whether Plaintiff simply used a standard Metalure product in its nail polish formulas, or whether it instead used Avery Dennison's manufacturing capabilities and expertise to create specialized metal dispersions that were better suited to Plaintiff's theories and formulas. A February 2, 1993 letter from Plaintiff's attorney, William Hanlon, to Avery Dennison seems to suggest that Plaintiff was using "off the shelf" Metalure products, (*see* Maybelline's Motion, Ex. 8), and a patent application prepared by Ted Jacob and his attorney similarly refers to the "preferred embodiment" of Jacob's invention as using a "commercially available" aluminum dispersion sold by Avery Dennison "under the trade name METALURE," (*id.,* Ex. 3, at 6). However, Jacob testified that he worked with Avery Dennison personnel to develop a product "from scratch" with a specific metal particle size. (Plaintiff's Motion, Ex. 3, Jacob Dep. at 114–15.) As further purported evidence of Plaintiff's separate technological contribution to the product it obtained from Avery Dennison, Plaintiff points to a written agreement between the two parties, which in turn refers to an attached "proprietary non-disclosure agreement" that "provides bi-lateral protection" for the two firms' respective technologies. (*Id.,* Ex. 7 at 2.)[3] This agree-

---

For convenience, these Defendants will be referred to collectively as "Maybelline."

**3.** The evidentiary value of this agreement is limited in several respects. First, Plaintiff has failed to produce a signed copy of the parties' purported non-disclosure agreement, and the unsigned copy provided as an exhibit does not delineate the parties' respective technological contributions to their joint project. (*Id.*) Sim-

ilarly, the underlying agreement itself does not disclose the technologies contributed by the two parties, and is entirely consistent with the conclusion that Avery Dennison contributed only its standard Metalure product. Finally, in an affidavit accompanying Maybelline's supplemental brief, Avery Dennison senior chemist James Rettker states that he reviewed his company's records for the relevant time

ment also includes Avery Dennison's promise "not to supply direct to [Plaintiff's] licensed manufacturers," (*id.*), but does not list these licensed manufacturers or indicate the products encompassed within this promise.

## C. Plaintiff's Business Relationship with Defendant Tevco

In mid–1992, Plaintiff contacted Defendant Tevco to seek its assistance in manufacturing nail polish using Plaintiff's formulas. These discussions led to the execution of an August 18, 1992 "Manufacturing Agreement" between Plaintiff and Tevco, under which (i) Plaintiff agreed to disclose certain technology to Tevco, (ii) Tevco was granted an exclusive license to use this technology in manufacturing products, and (iii) Tevco agreed to use this technology only in connection with the manufacturing activities encompassed within the Agreement.

### 1. The Terms of the Tevco Manufacturing Agreement

As discussed below, the parties disagree as to the exact scope of the "technology" covered by the Manufacturing Agreement. The Agreement itself addresses this issue through a series of somewhat circular definitions set forth in Section 1. First, the Agreement defines "Technology" as information "relating to the manufacture, design, marketing, distribution and use of the Licensed Products." (Tevco's Motion, Ex. A, Manufacturing Agreement, § 1.8.) "Licensed Products," in turn, are defined as "topically applied thermochromic nail polish and other nail care products incorporating the Licensed Technology." (*Id.* at § 1.6.) "Licensed Technology" is defined as referring "collectively to the Know–How and the Licensed Patents." (*Id.* at § 1.7.)

"Know–How" encompasses "all Technology not covered by a patent or patent application," while "Licensed Patents" includes all patents and patent applications "relating to the Licensed Products." (*Id.* at §§ 1.4, 1.5.) Finally, the definition of "Licensed Patents" incorporates an accompanying "Schedule A" of the relevant "Licensed Patents," and this Schedule lists a patent application filed on March 13, 1992, "in the name of Theodore A. Jacob, III and entitled '*Thermochromic Nail Composition*'." (*Id.*, Schedule A.)

Having defined the covered technology, the Agreement then recites the parties' duties with respect to this technology. First, Plaintiff agreed to "promptly disclose" to Tevco all "existing Licensed Technology reasonably related to the manufacture of the Licensed Products, unless such disclosure is not permitted under pre-existing agreements with third parties." (*Id.* at § 2.1.) Plaintiff further promised to provide to Tevco "any Licensed Technology which is developed or acquired by [Plaintiff] after the date of this Agreement and is reasonably related to the manufacture of the Licensed Products." (*Id.* at § 2.2.) However, this transferred technology remained "the exclusive property" of Plaintiff, with Tevco obtaining only a "beneficial interest," and Tevco was entitled to use this technology "only in connection with the manufacture of the Licensed Products in the Territory under the terms of this Agreement." (*Id.* at § 2.4.) [4]

Under the Manufacturing Agreement, Tevco was granted an "exclusive license to use the Licensed Technology to manufacture the Licensed Products in the Territory solely for" Plaintiff, without any right of assignment or transfer. (*Id.* at § 3.1.) Tevco was obligated to "accept orders for the Licensed Products only from custom-

---

period, that these records reflect Plaintiff's desire to "make use of Avery Dennison's processes and technology to attempt to create a copper-colored type of Metalure," and that this joint effort led to the development of an experimental product that was shipped only to one of Mr. Jacob's companies and was never marketed to other customers. (Maybelline's Suppl.Br., Ex. L, ¶ 9.)

**4.** The "Territory" is defined in the Agreement as encompassing the United States, Canada, Mexico, and the Caribbean. (*Id.* at § 1.9.)

ers design[at]ed by" Plaintiff, and to "promptly fill all orders for Licensed Products received from [Plaintiff's] customers." (*Id.* at §§ 10.1, 10.2.) Tevco's license would become non-exclusive if it was "incapable of meeting all orders by [Plaintiff] or for customers designated by [Plaintiff], for the Licensed Products." (*Id.* at § 3.3.)

Both Plaintiff and Tevco had obligations to preserve the confidentiality of "Trade Secrets," defined under the Agreement as "all technical and business information relating to any Know–How and unpatented Improvements" disclosed from one party to the other. (*Id.* at § 7.1.)[5] This definition, however, excludes information (i) "that is already known" to the recipient; (ii) "that is or becomes generally known to the public through no fault of" the recipient; (iii) "that is obtained without restriction from an independent source"; (iv) that a party "subsequently develops through entirely independent efforts"; or (v) that the disclosing party "approves for unrestricted release by prior written authorization." (*Id.*) Such trade secrets disclosed between the parties were to be "used solely for purposes of the activities authorized under this Agreement." (*Id.* at § 7.2.) Moreover, any trade secrets which were disclosed in writing and identified as such were to be treated as "proprietary information," protected "with the same degree of care" used by the recipient to safeguard its own trade secrets, and only disclosed to third parties upon the written consent of the disclosing party and under terms "requiring such third parties to maintain such information in confidence." (*Id.* at § 7.3.)

By its terms, the Agreement was to remain in effect for two years after its execution, with automatic one-year extensions unless one party notified the other in writing of its intent to terminate the agreement. (*Id.* at § 11.1.) During the initial period covered by the Agreement, the parties agreed "to work together and to use their best efforts to refine the Licensed Products until standards are attained to the satisfaction of each," with each party bearing its own expenses during this period. (*Id.*) The Agreement was subject to early termination, however, upon an uncured default or breach or Tevco's bankruptcy. (*Id.* at § 11.2.) Upon termination, Tevco's rights also terminated and reverted to Plaintiff, except for a three-month period for completion of outstanding performance, and Tevco was required to return various materials and documents to Plaintiff. (*Id.* at § 11.3.) The parties' obligations with regard to confidentiality of trade secrets and restricted use of trade secret information, however, remained "operative and in full force and effect indefinitely after the termination" of the Agreement. (*Id.*) Finally, the Agreement includes a standard merger/integration clause, (*id.* at § 13.8), and provides that it and the rights of the parties "shall be construed under, and be governed by, the laws of the State of Michigan," (*id.* at § 12).

### 2. The Parties' Dealings Under the Tevco Manufacturing Agreement

In practice, the business dealings between Plaintiff and Tevco were a good deal less formal than the terms of their Manufacturing Agreement might suggest. Generally, Tevco granted Ted Jacob free access to its laboratories, and he worked with various Tevco employees in developing his nail polish formulas. As part of this joint effort, Jacob brought a five-gallon pail of "silver solution" into Tevco's laboratories for use in producing samples of his formulas. This pail apparently contained the Metalure-type product obtained by Plaintiff from Avery Dennison, and this product, in turn, was added to various nail polish samples and sent to potential customers, including Maybelline.

---

**5.** "Improvements" include any "modification of the Licensed Technology, whether or not patentable, that provides an additional, enhanced or different functional capability, use or design, or higher degree of efficiency, reliability or cost effectiveness of a Licensed Product or the manufacturing process for a Licensed Product." (*Id.* at § 1.3.)

As noted, Plaintiff and Tevco offer differing views as to the technology covered by their Manufacturing Agreement. It is undisputed that Plaintiff did not disclose its metal flake technology to Tevco at the time the Agreement was executed in August of 1992. Rather, Jacob testified that his first disclosure to Tevco was limited to his thermochromic, color-changing nail polish concept, and that he did not disclose the metal flake concept to Tevco until September or October of 1992 because "[w]e have to first start with the first project and work to the second." (Jacob Dep. at 322–23.) Moreover, the Manufacturing Agreement itself refers only to "thermochromic nail polish and other nail care products," without mentioning metal flake technology, and lists a "thermochromic nail composition" as the sole invention for which Plaintiff currently was seeking a patent.

Plaintiff, however, contends that the metal flake technology was developed in connection with its work on thermochromic formulas, and that this connection is sufficient to bring the metal flake concept within the scope of the "Technology" covered by the Agreement. As evidence of this link, Plaintiff points to a memo Jacob sent to his attorney on October 28, 1992, disclosing a metal flake concept he developed "while working with thermoreactive nail lacquer trials," and suggesting that his pending patent application regarding thermochromic nail polish be expanded to "cover metal flakes in a nail lacquer." (Plaintiff's Suppl.Br., Ex. 7, at 2.) [6]

On the other hand, the parties' conduct after entering into the Manufacturing Agreement appears to undercut Plaintiff's effort to treat the thermochromic and metal flake concepts as variants of a single "technology." First, Tevco notes that Plaintiff entered into agreements with ATC Cosmetics and Decorative Industries, two other nail polish manufacturers, that specifically and separately list "thermochromic nail polish" and "metal flake fingernail compositions" as the two technologies covered by those agreements, (Tevco Reply Br., Ex. A, at 1 & § 1.6), while the Tevco agreement mentions only the former, thermochromic technology.[7] Indeed, Plaintiff's agreement with Decorative apparently granted an exclusive license to manufacture the technology encompassed within that agreement, (see Jacob Dep. at 420), seemingly placing the metal flake concept beyond the reach of the Tevco agreement.

Next, Tevco cites an August 17, 1993 letter from Jacob to Tevco requesting that the parties enter into "an agreement, separate than our previous agreement," under which "Tevco agrees to manufacture the Patent Pending Products of Metallic Slurries or Metal Pigments." (Tevco's Motion, Ex. B.)[8] Tevco responded the next day, stating that it preferred "to leave this on hold for the time being until we are into

---

**6.** Plaintiff also points to the recent deposition testimony of its former attorney, William Hanlon, as purportedly confirming that the Manufacturing Agreement encompassed both the thermochromic and metal flake technologies. This testimony, however, is at best inconclusive on this question. Indeed, Plaintiff's supplemental brief flatly misrepresents Hanlon's testimony by asserting that he agreed, at pages 144–45 of his deposition, that metal flakes were covered under the Agreement, (Plaintiff's Suppl.Br. at 3), when in fact he did not so testify. Moreover, Tevco has offered the affidavit of Stephen Kramer, Tevco's former counsel, who states that he negotiated the Manufacturing Agreement with Plaintiff, and that the negotiations and the resulting Agreement addressed only the ther-

mochromic technology. (Tevco's Reply Br., Ex. C.)

**7.** As the attorney who negotiated these agreements on Plaintiff's behalf, Hanlon conceded that this difference in language among the various agreements presumably was intentional. (Hanlon Dep. at 40–43.)

**8.** Defendants also have produced a June 15, 1993 letter from Jacob to Tevco, in which he states that Tevco and Plaintiff "have a current agreement for thermotone nail lacquers" that he wished to maintain, but that he planned to "begin using a second manufacturer of the second patent pending product of metallic lacquers." (Maybelline's Motion, Ex. 11.)

further development stages," because "[w]e have found that a lot of time was spent already and nothing has come of it." (*Id.*, Ex. C.) Tevco also declined to pay the cost of the "silver" brought by Jacob to Tevco's laboratories, and advised Jacob that "if you want we will return it to you and you can supply us with what we need for samples." (*Id.*) Accordingly, Jacob wrote to Maybelline on January 18, 1994, stating that "Tevco owns the sole [ ]right to manufacture ... the mood and color changing nail enamel," but that as to the "metallic nail enamel," he was advised that he "would have to carry the sole cost of developing the metallic products." (*Id.*, Ex. D.) Jacob also testified at his deposition that he gave a sample of the metallic polish to Decorative only "[a]fter Tevco already declined saying they didn't want to work in that industry, or work with that product at that time." (Jacob Dep. at 323.)

Thus, while it is clear that Plaintiff disclosed its metal flake formula to Tevco or, at a minimum, worked on this formula at Tevco's facilities and with the assistance of Tevco personnel, the parties sharply dispute whether this constituted a transfer of "technology" or disclosure of a "trade secret" as those terms are defined in the parties' Manufacturing Agreement. In any event, the parties continued to work jointly on the thermochromic product, but they ultimately abandoned this effort when, according to Tevco's Mitch Schlossman, the product proved unstable and did not gain the approval of the federal Food and Drug Administration ("FDA").[9] (Schlossman Dep. at 117–18.) However, the record does not indicate that either party ever gave the written notice required to formally terminate their Agreement.

**D. Plaintiff's Business Relationship with Defendant Maybelline**

As Plaintiff worked with such firms as Tevco and Decorative Industries in an effort to secure a manufacturer for its nail polish formulas, it also began meeting with various cosmetics companies as a means of ultimately introducing its products to consumers. In the fall of 1992, while working on his various formulas at Tevco's New Jersey research and manufacturing facilities, Ted Jacob first met with Maybelline's Vice President of Research and Development, George Ziets. Following this and other meetings, Maybelline began to consider and evaluate samples of Plaintiff's metal flake formulas,[10] and the parties executed a December 10, 1992 "Confidentiality Agreement" to govern this joint endeavor. The parties' relationship continued until 1994, when Maybelline elected not to pursue Plaintiff's products any further.

**1. The Terms of the Maybelline Confidentiality Agreement**

The December 10, 1992 Confidentiality Agreement includes various provisions regarding the disclosure, evaluation, and confidentiality of Plaintiff's "Technology," but does not actually define this covered "Technology." Instead, it establishes a 120–day "Option Period," during which Maybelline agreed to "study and evaluate the Product for the purpose of determining its concreteness, originality, novelty, proprietary value and our interest in its commercial utilization." (Maybelline's Motion, Ex. 1, ¶ 5.) Maybelline further agreed that, "[o]n or before the last day of the Option Period, we will indicate whether we are interested in negotiating for the purchase or use of the Technology." (*Id.* at ¶ 6.) If Maybelline advised Plaintiff that it was not interested in purchasing or using the technology, it would have no further obligations and the Agreement would ter-

9. Plaintiff also failed to secure patent protection for its thermochromic technology.

10. Although the parties apparently also discussed Plaintiff's thermochromic formulas,

Maybelline did not pursue this concept to any significant extent, and there is no claim in this case that Maybelline (or Tevco) misappropriated Plaintiff's thermochromic technology.

minate, with the exception of its confidentiality provisions, and Maybelline was not "obligated to provide reasons for rejecting the Technology." (*Id.* at ¶ 7.)

The Agreement's confidentiality provisions are limited in both duration and scope. First, the Agreement defines the relevant "Information" as restricted solely to "written confidential or proprietary information." (*Id.* at ¶ 1.) It then sets forth the steps Plaintiff was required to take in order to trigger Maybelline's confidentiality obligations:

> From time to time your company [*i.e.*, Plaintiff] may reveal confidential information to us [*i.e.*, Maybelline] relating to the Technology. All such technical information or data which is considered to be of a confidential or proprietary nature shall be disclosed or confirmed to us in writing, or if disclosed verbally, be reduced to writing within thirty (30) days. Each such written document shall be dated and contain the following bold letters on the first page thereof: "CONFIDENTIAL PROPERTY OF RAINBOW NAILS INC."

(*Id.*) For all "Information" satisfying these requirements, Maybelline agreed (i) to keep it "secret and confidential," (ii) not to reveal it to third parties, (iii) not to make "any use whatsoever" of it, "except for the purpose of evaluating the Technology," and (iv) to return it to Plaintiff "at the conclusion of this project." (*Id.* at ¶ 2.)

Under the Agreement, Maybelline's confidentiality obligations were "in effect for a period ending three (3) years from the date of this Agreement," or until December 10, 1995. (*Id.* at ¶ 3.) Moreover, these obligations did not extend to any information which (i) was in the public domain, either at the time of disclosure or thereafter, (ii) was already in Maybelline's possession at the time of disclosure, (iii) was developed by Maybelline "independent of the Information disclosed" by Plaintiff, or (iv) was received by Maybelline from a third party. (*Id.*) Finally, the Confidentiality Agreement could be modified only

through a written amendment signed by both parties, its terms were to be "governed by and construed in accordance with the laws of the State of Tennessee," and any disputes regarding the Agreement were to be litigated "in courts situated in the City of Memphis, State of Tennessee." (*Id.* at ¶¶ 10, 12.)

## 2. The Parties' Dealings Under the Maybelline Confidentiality Agreement

As was the case with Tevco, Plaintiff's business dealings with Maybelline did not fully conform to the formalities of the parties' written Agreement. Apparently, Plaintiff's submissions to Maybelline rarely, if ever, included the "CONFIDENTIAL PROPERTY" designation necessary to invoke the Agreement's confidentiality protections. For its part, Maybelline did not strictly adhere to the 120-day evaluation period set forth in the Agreement. Instead, for a time period spanning a year or more, Maybelline apparently performed periodic and ongoing assessments of Plaintiff's various formulas and refinements as they were submitted for Maybelline's consideration.

The metal-flake samples submitted for evaluation by Maybelline came from three sources: Plaintiff, Tevco, and Decorative Industries. None of these samples was designated as confidential. A polymer scientist at Maybelline at the time, Gary Graves, testified that his company was interested in developing a fast-drying nail polish, and that at least some of the formulas submitted by Plaintiff exhibited faster drying times than some of Maybelline's formulas. Similarly, Terry Jacks, Maybelline's former Senior Director of Research and Development, testified that the results of Maybelline's tests with Plaintiffs fast-drying formulas were "encouraging." (Jacks Dep. at 124.) However, Jacks also noted various concerns with Plaintiff's formulas, including "some inconsistencies in dry time," limitations in the available palette of colors as a result of using aluminum

in the formula, and "plating problems,"where the metal particles would stick to the sides of the nail polish bottle. (*Id.* at 144, 191–92.)

In addition to submitting formulas, Plaintiff also provided Maybelline with other materials, including reports, ingredient lists, and a patent application Jacob was preparing for submission to the U.S. Patent and Trademark Office ("PTO"). Again, it does not appear that any of these materials were marked "confidential." Jacob's patent application was rejected by the PTO on three occasions, in part on the basis of "obviousness," as prior art had taught "the usefulness of [aluminum] dispersion for coating and paints," and it would have been "within the ken of the skilled chemist" to vary the particle distribution "to achieve the optimum result." (Maybelline's Response Br., Ex. B.)[11] Jacob ultimately abandoned his efforts to secure a patent, citing financial difficulties.

During the course of its relationship with Maybelline, Plaintiff also submitted samples of its formulas to several of Maybelline's competitors in the cosmetics industry, including such companies as Revlon, Orly International, and Pavion. (*See* Maybelline's Motion, Ex. 9.)[12] These samples were sent either by Plaintiff directly, or by Tevco or Decorative Industries at Plaintiff's direction. Although Jacob testified that he obtained confidentiality agreements from most of the companies that received these samples, he apparently has been able to produce only six such agreements (including the Tevco agreement),

most of which, by their terms, address only the thermochromic concept.

In 1994, Maybelline terminated its relationship with Plaintiff. In an undated fax apparently sent in early 1994, Jacob stated that "time is of the essence," and asked that the parties "solidify an agreement for technical support and consulting fees," at a suggested amount of $2,000 per month "to carry the cost of patent work already completed and expenses thus far." (Plaintiff's Motion, Ex. 18.) By letter dated March 15, 1994, George Ziets of Maybelline responded negatively to this request:

> This will confirm our discussion of March 15, where due to program changes relative to emphasis and direction at Maybelline, we have decided to terminate our investigation of your technology applications in the areas of nail, pencil and lipstick. Based on our decision, you are free to pursue discussions with other companies as you so desire.

(*Id.,* Ex. 19.)[13]

According to Terry Jacks, Maybelline terminated its relationship with Plaintiff in part because Maybelline had independently developed its own fast-drying nail polish formula. Jacks testified that Maybelline's own product had proven to be "all around a better formula," while the company had achieved only "mixed results" with Plaintiff's formulas, and had been unable to resolve the problems with Plaintiff's products to Maybelline's satisfaction. (Jacks Dep. at 190–91.) In addition, upon learn-

---

11. Maybelline also has produced various patents which pre-dated Jacob's application and which, according to Maybelline, defeat any claim that Jacob first came up with the idea of using small metal flakes in nail polish. (*See* Maybelline's Motion, App. B, Exs. 1–14.) Plaintiff also has produced a note from the files of Plaintiff's attorney, William Hanlon, indicating that one of these prior patents, the "Kaye '870" patent issued in 1973, was "[v]ery close." (Maybelline's Suppl.Br., Ex. G.)

12. Indeed, in support of its motion for summary judgment, Maybelline has compiled a

list of 39 companies with which Plaintiff shared samples or ingredient lists. (*Id.*) Jacob could not recall how many companies received these samples, stating only that "I just know it went as you can see around the world pretty quick." (Jacob Dep. at 82.)

13. Although this letter seemingly terminated the parties' relationship, Plaintiff points to an August 5, 1994 letter from Maybelline to Decorative Industries, which apparently refers to Maybelline's more recent tests of certain of Plaintiff's formulas. Thus, it is unclear precisely when Maybelline ceased to evaluate Plaintiff's samples.

ing in late 1993 that Plaintiff was sharing its formulas with other companies in the nail polish industry, Jacks expressed "great reservation" about Maybelline's continued collaboration with Plaintiff, (Plaintiff's Motion, Ex. 20), and he testified as to his concern that Maybelline was "doing all the legwork" while Plaintiff was "shopping [its formulas] around," (Jacks Dep. at 132).

In 1996, Maybelline began selling its "Express Finish" line of fast-drying nail polish formulas. Maybelline has received two patents on this formula, and these patents list Gary Graves and Terry Jacks as the inventors. The "Express Finish" formula combines a soluble vinyl silicone copolymer, sold by 3M under the product name "VS–80," and dimethicone, an anti-bubbling agent. When Ted Jacob saw Maybelline's product in a store in approximately August of 1996, he purchased some of this polish, ran various tests, and concluded that Maybelline had misappropriated his formulas. Just over two years later, in late 1998, Plaintiff brought this suit.

### E. Procedural Background

Plaintiff filed this action in Oakland County Circuit Court, State of Michigan, on December 9, 1998. Its Complaint includes eight counts: (1) breach of Confidentiality Agreement by Maybelline; (2) fraud and misrepresentation by Maybelline; (3) breach of Manufacturing Agreement by Tevco; (4) fraud and misrepresentation by Tevco; (5) misappropriation of trade secrets by both Maybelline and Tevco;[14] (6) breach of implied duty of good faith by both Maybelline and Tevco; (7) civil conspiracy among Maybelline, Tevco, and unknown corporations and individuals; and (8) a plea for injunctive relief precluding any further disclosure or use of Plaintiff's technology. On January 11, 1999, Defendants removed the case to this Court, citing complete diversity of citizenship among the parties.

By motions filed on September 30, 1999, Plaintiff, Tevco, and Maybelline all seek summary judgment in their favor. Each party has filed response and reply briefs, as well as a supplemental brief addressing materials produced and depositions taken in the later stages of discovery. On March 23, 2000, the Court held a hearing on the parties' cross-motions.

### III. *ANALYSIS*

#### A. The Standards Governing the Parties' Cross–Motions

Plaintiff, Tevco, and Maybelline all seek summary judgment in their favor pursuant to Fed.R.Civ.P. 56. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex*:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

**14.** Although this Count also includes a claim of conversion, Plaintiff has conceded that "its claim is properly one for misappropriation, not conversion." (Plaintiff's Response to Maybelline's Motion, at 18 n. 8.)

which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in considering the parties' cross-motions for summary judgment.

### B. Plaintiff's Breach of Contract Claim Against Defendant Tevco

In Count III of its Complaint, Plaintiff alleges that Tevco breached the parties' August 18, 1992 Manufacturing Agreement by (i) failing to preserve the confidentiality of the information and technology disclosed by Plaintiff, (ii) revealing this information and technology to third parties, (iii) using this information and technology for its own benefit, and (iv) manufacturing the product developed by Plaintiff for third parties, including Maybelline, without Plaintiff's prior written consent. (Complaint at ¶ 44.) Tevco now moves for summary judgment in its favor on this breach of contract claim, contending that there are several fatal deficiencies in the factual support for this claim.[15] Specifically, Tevco argues (i) that the Manufacturing Agreement does not encompass the metal flake formula upon which Plaintiff's claims are based; (ii) that there is no evidence that Tevco used or disclosed any information or technology relating to the metal flake formula without Plaintiff's permission; and (iii) more specifically, that it has never manufactured Maybelline's allegedly infringing "Express Finish" line of nail polish.[16] Upon reviewing the evidentiary record before it, the Court agrees with Tevco on each of these points.

The August 18, 1992 Manufacturing Agreement provides that it is to be construed under Michigan law, and that this law likewise governs the rights of the parties under the Agreement. (Tevco's Mo-

15. Plaintiff also has moved for summary judgment in its favor on this claim. However, as noted in Tevco's response, Plaintiff's motion focuses almost entirely on the actions of Maybelline, and seldom refers to Tevco. Moreover, Plaintiff's motion fails to set forth any argument whatsoever as to why summary judgment should be awarded in its favor on this claim.

16. Tevco also argues that Plaintiff forfeited any possible confidentiality protection under the Agreement by widely disclosing its metal flake technology to others in the cosmetics industry, and that, in any event, Plaintiff's technology was insufficiently novel to warrant confidentiality protection. These arguments will be addressed below, in the portion of this Opinion considering Plaintiff's breach of contract claim against Maybelline.

tion, Ex. A, Manufacturing Agreement at § 12.) Thus, in considering Plaintiff's breach of contract claim against Tevco, the Court looks to Michigan contract law for guidance.

■ As explained by the Michigan Supreme Court, "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994). If possible, this intent must be ascertained through "the words used in the instrument," as the Court "does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Sheldon–Seatz, Inc. v. Coles*, 319 Mich. 401, 29 N.W.2d 832, 834–35 (1947) (internal quotations and citation omitted). The initial determination whether contract language is ambiguous is a question of law, and, where there is no ambiguity, the meaning of the contract likewise is a question of law for the Court to decide. *Port Huron Educ. Ass'n v. Port Huron Area School Dist.*, 452 Mich. 309, 550 N.W.2d 228, 237 (1996). Only "[w]here the contract language is unclear or susceptible to multiple meanings" does its interpretation become a question for the trier of fact, *id.*, and the Court must take care to avoid "creat[ing] ambiguity where none exists." *Smith v. Physicians Health Plan, Inc.*, 444 Mich. 743, 514 N.W.2d 150, 157 (1994).

### 1. The Tevco Agreement Encompasses Only the Thermochromic Technology, and Not the Metal Flake Concept at Issue Here.

■ . As its first basis for seeking summary judgment on Plaintiff's breach of contract claim, Tevco asserts that the Manufacturing Agreement does not encompass the metal flake technology and formulas at issue in this suit, so that Tevco had no contractual obligations with respect to this technology. As noted earlier,

Plaintiff does not contend in this suit that any Defendant misappropriated any technology or concepts relating to its "thermochromic," color-changing nail polish formulas. Accordingly, if Tevco is correct in claiming that its Agreement with Plaintiff dealt *only* with this thermochromic technology, there could be no breach of the Agreement arising from the misuse or misappropriation of any *other* technology, such as Plaintiff's metal flake formulas.

On its face, the Manufacturing Agreement certainly appears to be limited to Plaintiff's thermochromic technology. In two of its initial recitals, it states that Plaintiff "possesses certain proprietary information and know-how for the manufacture of thermochromic nail polish," and that Tevco "desires to acquire a license to manufacture thermochromic nail polish and nail care products exclusively for [Plaintiff] using [Plaintiff's] proprietary information and know-how." (Manufacturing Agreement at 1.) Similarly, while, as discussed earlier, the definitional portion of the Agreement is not a model of clear draftsmanship, it defines "Licensed Products" as "topically applied thermochromic nail polish and other nail care products incorporating the Licensed Technology," and defines "Technology," in turn, as information "relating to the manufacture, design, marketing, distribution and use of the Licensed Products." (*Id.* at §§ 1.6, 1.8.) Moreover, "Licensed Technology" is defined collectively as "Know–How" and "Licensed Patents," and the only "Licensed Patent" listed in Schedule A to the Agreement is a patent application filed by Ted Jacob entitled "*Thermochromic Nail Composition.*" (*Id.* at §§ 1.5, 1.7, Schedule A.) Finally, metal flake technology is nowhere mentioned in the Agreement, and Jacob testified that he had not yet disclosed this technology to Tevco at the time the parties executed the Agreement. Given all this, it is difficult to read the Agreement as encompassing the metal flake concept at issue in this suit.

Plaintiff argues, however, that the reference in the definition of "Licensed Products" to "other nail care products" is sufficiently broad to encompass its metal flake technology, particular where, according to Jacob, this technology flowed out of the work he performed in developing and evaluating various thermochromic formulas. As an initial matter, Plaintiff's argument quickly runs afoul of the Agreement's integration clause and its requirement that any modifications be made in writing. To the extent that Plaintiff seeks to rely on extrinsic evidence of prior or contemporaneous discussions or understandings between the parties as a guide to interpreting the Agreement, both the "Entirety of Agreement" clause, (*id.* at § 13.8), and the parol evidence rule, *see UAW–GM Human Resource Ctr. v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 414–15 (1998), forbid any consideration of such evidence, unless the Agreement is first found to be ambiguous. The Court is not at all convinced that the Agreement's reference to "other nail care products" renders it ambiguous, particularly where such "other products" are reached by the Agreement only if they incorporate the "Licensed Technology," and where the Agreement as a whole clearly and repeatedly speaks only of thermochromic technology, without ever mentioning the metal flake concept. In contrast, Plaintiff's agreements with other parties refer separately to thermochromic and metal flake compositions as distinct "Licensed Products," both of which are covered by those agreements. (*See* Tevco's Suppl.Br., Ex. C (comparing contractual language).)

Next, to the extent that Plaintiff seeks to rely on the parties' subsequent conduct as purportedly amending their Agreement, such an argument is precluded by the clause providing that "[t]his Agreement shall not be modified or rescinded except by a written instrument setting forth such modification or rescission and signed by the parties." (Manufacturing Agreement at § 13.5.) Thus, while it is clear that Tevco did not confine itself solely to manufacturing samples of Plaintiff's thermochromic formulas, but also worked with Plaintiff to produce samples using Plaintiff's metal flake concept, this conduct does not serve to modify the parties' prior written agreement which, on its face, refers only to the thermochromic technology.[17]

In any event, even if there were a basis for looking to extrinsic evidence to determine the scope of the Agreement, this evidence uniformly leads to the conclusion that the Agreement encompassed only the thermochromic technology. First, as noted, subsequent agreements executed between Plaintiff and other parties refer to Plaintiff's thermochromic and metal flake compositions as separate and distinct technologies. More importantly, Ted Jacob himself apparently recognized this distinction in his post-Agreement correspondence with Tevco. In a June 15, 1993 letter to Tevco, Jacob identifies Plaintiff's "two projects" as "thermotone and metallic nail lacquers." (Maybelline's Motion, Ex. 11.) Jacob then states that Tevco and Plaintiff "have a current agreement for thermotone nail lacquers" that he wished to maintain, but that he planned to "begin using a second manufacturer of the second patent pending product of metallic lacquers." (*Id.*)[18] Similarly, in an August 17, 1993 letter to Tevco, Jacob requests that the

---

**17.** It also is worth noting that much of Plaintiff's extrinsic evidence as to the purported connection between the thermochromic and metal flake technologies was not available to Tevco at the time the parties signed their Agreement. For example, in an effort to establish this link, Plaintiff points to an October 28, 1992 fax sent by Ted Jacob to his attorney, which indicates that Jacob developed his metal flake concept "while working with thermoreactive nail lacquer trials." (Plaintiff's

Suppl.Br., Ex. G, at 2.) Yet, it does not matter that Plaintiff considered these as related technologies, unless there was a "meeting of the minds" between Plaintiff and Tevco as to this relationship at the time they executed their Agreement.

**18.** In its response to Tevco's motion, Plaintiff endeavors mightily to construe this letter as indicating that the parties' Agreement covered both the thermochromic and the metal flake

parties enter into "an agreement, separate than our previous agreement," under which "Tevco agrees to manufacture the Patent Pending Products of Metallic Slurries or Metal Pigments." (Tevco's Motion, Ex. B.)

Finally, as Tevco points out, if Plaintiff's Agreement with Tevco encompassed the metal flake technology, then Plaintiff seemingly would have been forbidden under the Agreement's exclusivity provision from licensing any other company to use this technology within the covered North American territory. (*See* Manufacturing Agreement at § 3.1.) Yet, Jacob testified that, within a few months after the Manufacturing Agreement was executed, he granted Tevco's competitor, Decorative Industries, an exclusive license to manufacture Plaintiff's metal flake products within the United States. (Jacob Dep. at 420, 492.) Consequently, if, as Plaintiff now contends, the Manufacturing Agreement encompassed the metal flake technology, Plaintiff would have breached this Agreement by entering into its exclusive arrangement with Decorative.

In short, both the language of the Manufacturing Agreement itself and Plaintiff's subsequent conduct lead to the same result—that the Agreement covered only Plaintiff's thermochromic technology. Because there is no claim in this case of any improper use or disclosure of this technology, Plaintiff cannot prevail in its breach of contract claim against Tevco.

### 2. There Is No Evidence of Any Improper Use or Disclosure by Tevco of Plaintiff's Metal Flake Technology.

▪ Even assuming the Tevco agreement encompassed the metal flake technol-

ogy at issue here, Plaintiff still would have to show that Tevco breached this agreement by improperly disclosing or using the technology given to it by Plaintiff. In its Complaint and subsequent filings, Plaintiff suggests the following breaches by Tevco: (i) that Maybelline's purported use of Plaintiff's technology in its "Express Finish" product line is in some way attributable to Tevco; and (ii) that Tevco's recent purchase and use of Avery Dennison's "Metalure" products constitutes a misuse of Plaintiff's technology. These claimed breaches, however, lack any basis in the evidentiary record.

As an initial matter, before it can be determined whether Tevco improperly disclosed or used the technology at issue here, the Court first must ascertain precisely *what* technology is at issue here. As Defendants note, this has proven to be an elusive task, as Plaintiff seeks, in effect, to "reverse engineer" its claims by continually altering its theory of recovery to fit the latest piece of evidence. In any event, as a starting point, the Complaint defines the "Technology" at issue as "the introduction and application of metal flakes into nail polish." (Complaint at ¶ 7.) The Complaint further alleges that Tevco is using this technology to manufacture infringing products "for and/or on behalf of" Maybelline, and it identifies Maybelline's "Express Finish" as the infringing product in question. (Complaint at ¶¶ 25, 28.)

However, this attempted linkage between Tevco and Maybelline's "Express Finish" product quickly founders on the evidentiary record. First, Maybelline has emphatically denied that Tevco ever was

---

technologies. (*See* Plaintiff's Response to Tevco's Motion, at 10.) Yet, Jacob's reference in this letter to a perceived "breach of our contract" does not in any way support the inference that Plaintiff seeks to draw. To the contrary, Jacob appears to be complaining that an exclusivity agreement between Tevco and a third party, Pavion, was being construed in such a way as to defeat Plaintiff's

ability to use a different manufacturer, other than Tevco, to supply metal flake samples to Pavion. Viewed in this way, the letter, and its reference to a "breach of our contract," appears to be Jacob's caution that Tevco should not seek to extend its exclusive rights *beyond* the thermochromic technology that was the subject of the "current agreement" between the parties.

involved in the manufacture of its "Express Finish" product, and has stated instead that one of Tevco's competitors, Kirker Enterprises, is the exclusive manufacturer of this product line. (*See* Tevco's Motion, Ex. E, Maybelline Discovery Responses at 11, 14–15; Graves Dep. at 269.)[19] Nothing in the record casts doubt upon these assertions.[20]

This leaves Plaintiff merely to speculate that Tevco "must have been" involved, in some unspecified way, in Maybelline's development of its "Express Finish" product because, after all, Maybelline received samples of Plaintiff's products from Tevco, and the parties generally worked with each other and shared information during the course of Plaintiff's collaborations with Tevco and Maybelline.[21] This argument, however, overlooks the fact that *other* parties, including Decorative Industries and Plaintiff itself, *also* provided Maybelline with samples of Plaintiff's products. Thus, even assuming Maybelline's "Express Finish" product incorporates Plaintiff's technology, Plaintiff can offer nothing beyond sheer conjecture that Tevco was the conduit through which Plaintiff's technology passed to Maybelline. Against this mere supposition, Tevco points to the affirmative testimony of the two inventors of Maybelline's "Express Finish" formula, Terry Jacks and Gary Graves, both of whom testified that Maybelline did not use any of Plaintiff's technology or information, whether from Tevco or any other source, in developing this formula. (Jacks Dep. at 190; Graves Dep. at 278–79.)

Faced with this evidentiary dilemma, Plaintiff next contends that Tevco misappropriated Plaintiff's technology by using Avery Dennison's "Metalure" products in nail polish manufactured for cosmetics companies other than Maybelline. Even here, however, it is difficult to sort out Plaintiff's precise claim as to the "technology" protected by the parties' Manufacturing Agreement. At times, Plaintiff emphatically states that it "did not use any of the existing Metalure line of products in its own process or products," and that it instead "used Avery Dennison's technicians ... as quality control experts in implementing its own procedures." (Plaintiff's Response to Maybelline's Motion, at 22.)[22] Thus, according to Plaintiff, the novelty of its technology lies in the "particle size" of the metal flakes introduced into its fast-drying formulas, (*id.*), and this technology is not available through Avery Dennison's pre-existing products, (*see* Plaintiff's Response to Tevco's Motion, at 12 (stating that the "real innovation of Mr. Jacob's technology was the size of the metallic particles used," and that Jacob

---

**19.** More generally, Tevco states that Maybelline "switched all of its business from Tevco to Kirker years ago, except for two very basic, clear product formulae that pre-existed" Plaintiff's relationship with Tevco. (Tevco's Motion at 10.)

**20.** Indeed, Ted Jacob conceded at his deposition that he has no evidence that Tevco ever manufactured any allegedly infringing product sold to consumers. (Jacob Dep. at 281.) His only basis for any suspicion to the contrary was his relatively recent discovery of a vat labeled "Maybelline" as he passed through a Tevco manufacturing facility. He concedes, however, that this "could have been an old label," and that the substance in this vat might not have been a product at issue in this case. (*Id.* at 280, 381.)

**21.** Plaintiff also contends, without support in the record, that Maybelline "insisted" that Plaintiff work only with Tevco. First, if this is so, Maybelline's insistence was ineffective, because Plaintiff indisputably worked with other manufacturers, including Decorative Industries. Next, the record shows, at best, that Maybelline complained about Plaintiff's use of multiple manufacturers as part of its general concern that Plaintiff was "shopping around" its products to a variety of companies. (*See, e.g.,* Plaintiff's Motion, Ex. 20; Jacks Dep. at 125–26, 129–30.)

**22.** It should be noted that this assertion seemingly is contradicted by documents produced by Plaintiff itself. In particular, a July 26, 1993 invoice sent by Plaintiff to Tevco refers to the product "L 55350," (Plaintiff's Response to Tevco's Motion, Ex. 7), but an Avery Dennison brochure shows that the "L–55350" form of its "Metalure" product was available as long ago as 1988, (*id.*, Ex. 5.)

showed Avery Dennison how to produce such particles)). Yet, if this is so, Plaintiff has failed to identify any subsequent use of this "specialized Metalure" technology by Tevco (or anyone else, for that matter). In particular, the record conclusively establishes (i) that Tevco used only "off-the shelf" Metalure (and, even then, this use apparently began in 1999, after this suit was filed); (ii) that the form of Metalure used by Tevco was available long before Plaintiff and Tevco entered into their Manufacturing Agreement; and (iii) that the lone experimental product developed jointly by Plaintiff and Avery Dennison was never marketed or sold to Tevco, or to any other entity other than Ted Jacob's own businesses.

This leads Plaintiff to shift its position once again, and to contend that *any* use of small metal flakes in nail polish—and, thus, any use of even "off-the-shelf" Metalure—constitutes a misappropriation of its technology. (*See, e.g.,* Jacob Dep. at 252; Jacob 2/21/00 Dep. at 342).[23] Again, however, there are several problems with this theory. First, as an off-the-shelf product that has been publicly available and described in brochures at least as far back as 1988, Metalure provides a less-than-solid foundation for any claim by Plaintiff of trade secret or confidentiality protection. *See Aerospace America, Inc. v. Abatement Technologies, Inc.,* 738 F.Supp. 1061, 1070 (E.D.Mich.1990) (noting that "information which is disclosed to the world by product marketing does not constitute a 'trade secret.' "). Clearly, Plaintiff cannot claim any such protection arising from the *manufacture* of Metalure, as any claim of this sort would belong to Avery Dennison. *See TGC Corp. v. HTM Sports, B.V.,* 896 F.Supp. 751, 760 (E.D.Tenn.1995). Further, Avery Dennison no doubt would be

chagrined to learn that nail polish manufacturers cannot purchase even "off-the-shelf" Metalure products without Plaintiff's consent, despite the language of Avery Dennison's agreement with Plaintiff, which precluded only sales to Plaintiff's "licensed manufacturers," (Plaintiff's Response to Tevco's Motion, Ex. 1, at 2), and which presumably covered only the "specialized Metalure" developed jointly by Plaintiff and Avery Dennison.[24]

Next, even assuming Plaintiff was the first to arrive at the precise concept of using Metalure in nail polish, it cannot claim trade secret or confidentiality protection for concepts disclosed in patents or readily discernible to others in the industry. *See Aerospace America,* 738 F.Supp. at 1070; *TGC Corp.,* 896 F.Supp. at 757–58. As noted earlier, Maybelline has produced a variety of patents, dating back as far as 1938, which refer to the notion of metal particles or flakes in nail polish. (*See* Maybelline's Motion, App. B.) Moreover, Avery Dennison's 1988 brochure suggests the use of Metalure in "printing inks, coatings and paint." Thus, as one basis for rejecting Ted Jacob's patent application, the PTO concluded that the use of aluminum dispersions such as Metalure in nail polish was "obvious" in light of the prior art. (Maybelline's Response Br., Ex. B.)

Finally, under the Manufacturing Agreement, Tevco was entitled to use any information it "obtained without restriction from an independent source." (Manufacturing Agreement at § 7.1(iii).) The record fails to establish that Tevco's 1999 purchase of Metalure was attributable to or inspired by Plaintiff's prior use of Metalure. Rather, one of the Tevco employees

---

**23.** Indeed, as discussed below in the Court's consideration of the claims against Maybelline, Plaintiff maintains, at times, that the use of *any* small particle, including silicone, is a misappropriation of its technology.

**24.** In fact, if Tevco's purchase of Metalure could constitute misappropriation of technol-

ogy first disclosed by Plaintiff, then Avery Dennison's sale of Metalure to Tevco likewise would arguably constitute a breach of Avery Dennison's separate agreement with Plaintiff. Yet, Plaintiff has not asserted any claims against Avery Dennison in this case.

who worked most closely with Ted Jacob, Debbie Dallas, testified that Jacob never mentioned Metalure or Avery Dennison in reference to the metal solution he used in his formulas, and that she first learned of Metalure at a trade convention in Florida. (Dallas Dep. at 190–91, 275, 283.) Nor is there any other evidence that Ted Jacob ever disclosed to Tevco that his pail of "silver solution" was, in fact, some sort of Metalure-type product, or that this or a similar solution could be purchased from Avery Dennison.

In sum, even assuming Plaintiff's Manufacturing Agreement with Tevco covered the metal flake technology at issue in this suit, there simply is no evidence that Tevco breached this Agreement by improperly disclosing or using this technology. This lack of evidence of improper disclosure or use defeats Plaintiff's breach of contract claim against Tevco.

## C. Plaintiff's Breach of Contract Claim Against Defendant Maybelline

In Count I of its Complaint, Plaintiff alleges that Maybelline breached the Confidentiality Agreement executed by the parties in December of 1992. Much of the above discussion as to Plaintiff's breach of contract claim against Tevco applies equally to Plaintiff's breach of contract claim against Maybelline. There is, however, one important distinction: namely, the Maybelline Agreement undeniably covers Plaintiff's metal flake formulas, as this Agreement's definition of "Technology" is not limited to any particular concepts or products. Nevertheless, in its motion for summary judgment, Maybelline argues that Plaintiff cannot establish a breach of this Agreement, because (i) Plaintiff did not designate the information disclosed to Maybelline as "confidential," as required to trigger confidentiality protection under the Agreement; (ii) much of this information falls within one or more of the Agreement's exceptions to confidentiality protection; and (iii) there is no evidence that Maybelline actually used or disclosed any

technology in violation of the Agreement. Again, the Court finds considerable merit in each of these contentions.

**1. Plaintiff Failed to Trigger the Agreement's Confidentiality Provisions by Designating Its Information as "Confidential."**

■ Paragraph 2 of the Maybelline Confidentiality Agreement sets forth Maybelline's obligations to preserve the confidentiality of "Information" provided by Plaintiff, and not to use this "Information" except for the purpose of evaluating Plaintiff's technology. However, paragraph 1 states the conditions that must be satisfied before a disclosure may be considered "Information," and hence subject to the Agreement's confidentiality and misappropriation provisions. In particular, this paragraph states that only "written confidential or proprietary information" is protected under paragraph 2. (Maybelline's Motion, Ex. 1, Confidentiality Agreement at ¶ 1.) Even then, such written documents are protected only if they are "dated and contain the following bold letters on the first page thereof: 'CONFIDENTIAL PROPERTY OF RAINBOW NAILS, INC.'" (*Id.*)

Plaintiff does not dispute that it failed, at least generally, to adhere to these requirements. In particular, the samples submitted by Plaintiff for Maybelline's evaluation included no confidentiality designation. (Jacob Dep. at 212–14.) Nevertheless, Plaintiff argues that such "technical" violations do not waive its right to insist that Maybelline preserve the confidentiality of its technology. Plaintiff concedes, however, that the Maybelline Agreement was the product of extensive discussions between the parties, that Ted Jacob was represented by "a few" lawyers during these discussions, and that Jacob read and understood the Agreement at the time he signed it on Plaintiff's behalf. (*Id.* at 68, 72.) Under these circumstances, the Court is aware of no law that would relieve a party of its obligations under a signed

agreement, regardless of how "technical" these obligations might be.[25]

Plaintiff also argues, citing *Hayes–Albion v. Kuberski*, 421 Mich. 170, 364 N.W.2d 609, 614 (1984), that its trade secrets are entitled to protection, even in the absence of a written agreement. This contention, while true, does not rescue Plaintiff's breach of contract claim; it merely permits Plaintiff to bring a separate common-law claim against Maybelline for improper disclosure or use of its trade secrets (and Plaintiff has, in fact, asserted such a claim). Under the Agreement, Maybelline incurred only specific obligations as to the confidentiality and permitted uses of information disclosed by Plaintiff, and only if Plaintiff first satisfied the Agreement's requirements for designating information as confidential. Because Plaintiff did not meet these preconditions for confidentiality under the Agreement, the information supplied by Plaintiff was not protected under the Agreement, and Maybelline could not have breached the Agreement by disclosing or using the information in question.

### 2. Plaintiff's Apparent Use of Off–the–Shelf Products and Previously Known Concepts and Its Wide Disclosure of Its Formulas Defeat Its Claims of Confidentiality.

■ Under the Maybelline Confidentiality Agreement, certain information disclosed by Plaintiff was exempt from the confidentiality obligations imposed in paragraph 2. Specifically, the Agreement did not reach, among other things: (i) information in the public domain at the time of disclosure, (ii) information which subsequently entered the public domain through no fault of Maybelline, and (iii) information received by Maybelline from another source. (Confidentiality Agreement at ¶ 3.) Maybelline argues that these exceptions encompass much, if not all, of the technology disclosed by Plaintiff under the Agreement. The Court agrees.

First, insofar as Plaintiff's breach of contract claims against Maybelline and Tevco rest upon the same metal flake or Metalure-based technology, the Court already has noted the defects in these claims. As noted earlier, existing patents in the public domain had suggested the use of metal flakes in nail polish well before Plaintiff began experimenting with metal flake formulas in 1992. Indeed, Plaintiff's own patent attorney apparently recognized this, observing in early 1993 that one patent in particular, the "Kaye '870" patent issued in 1973, was "very close." (Maybelline's Suppl.Br., Ex. G.) The files of Plaintiff's attorney also included a patent search that turned up a 1986 French patent disclosing the use of 3 to 30 micron gold flakes in nail polish. (*Id.*, Exs. H, I.) Still another patent, the "Levine '087" patent issued in 1982 and assigned to Maybelline's competitor, Revlon, discloses a process for making metallic leafing pigments, refers to metal particles

---

25. The Court notes that the Confidentiality Agreement includes a choice-of-law provision stating that it "shall, for all purposes, be governed by and construed in accordance with the laws of the State of Tennessee." (Confidentiality Agreement at ¶ 12.) Presumably, this provision was inserted at the request of Maybelline. Yet, in its motion, Maybelline asserts that "there seems to be no significant difference between Michigan and Tennessee law on the contract issues," and that, therefore, "judicial efficiency counsels that the law of the forum may be applied." (Maybelline's Motion, at 9–10.) Maybelline then proceeds to rely largely on Michigan law in support of its arguments. Seemingly, then,

Maybelline has waived any claim that Tennessee law should govern Plaintiff's breach of contract claim.

For its part, Plaintiff agrees with Maybelline that "the relevant case law of both Michigan and Tennessee are similar," but it argues that "Tennessee law is primary," as this reflects the parties' agreement. (Plaintiff's Response to Maybelline's Motion, at 7 n. 5.) Yet, confusingly, Plaintiff then proceeds to cite Michigan cases, and not Tennessee decisions. In any event, the Court agrees with the parties that, for purposes of the issues presented in the pending cross-motions, there are no relevant distinctions between Michigan and Tennessee contract law.

between 25 and 50 microns in size, and notes the historic "use of metal coatings for decoration and ornamentation" and the commercial importance of "metallic pigments." (Maybelline's Motion, App. B, Ex. 8.) Finally, as discussed earlier, the product literature for Metalure promotes the use of aluminum dispersions in printing inks, coatings and paints, and the PTO cited this in rejecting, on "obviousness" and other grounds, Plaintiff's patent application disclosing the use of Metalure in nail polish. Given all this, Plaintiff's technology arguably was "public domain" information at the time of its disclosure, and hence was exempt from protection under the Maybelline Agreement.

Moreover, any confidentiality protection Plaintiff might have claimed with respect to its metal flake technology was seriously undermined, if not defeated, by Plaintiff's widespread dissemination of its formulas. In an exhibit in support of its motion, Maybelline lists no fewer than 39 companies to which Plaintiff disclosed its products. (*See* Maybelline's Motion, Ex. 9.) Although Plaintiff contends that it did not disclose its formulas without first securing the appropriate assurances of confidentiality, it has produced only six such purported agreements, claiming that the rest have been lost. As observed by the Michigan Court of Appeals, "[t]o be a trade secret, the information must, of necessity, be a *secret:* specifically, there must be evidence presented that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality." *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 224 N.W.2d 80, 87 (1974). Such measures may include express confidentiality agreements, disclosures in confidence un-der circumstances evincing a shared understanding that the information is confidential, or security precautions designed to ensure that only a limited number of authorized persons have access to the information. *Kubik,* 224 N.W.2d at 87. Plaintiff has offered scant evidence of such measures in this case.

In any event, where information is sufficiently widespread that it is available to a substantial segment of the relevant industry, it can hardly be said to be "confidential" or "secret." *See Aerospace America,* 738 F.Supp. at 1070; *see also Hayes–Albion,* 364 N.W.2d at 614 (noting that one factor in determining whether information qualifies as a trade secret is "the extent to which the information is known outside of [one's] business" (quoting Restatement (Second) of Torts § 757, cmt. b)). In this Court's view, such widespread disclosure arguably is tantamount to placing the information into the "public domain," at which point it is no longer protected under the Maybelline Agreement.[26]

Finally, Maybelline points out that the scope of the Tevco Manufacturing Agreement has implications to the scope of Maybelline's confidentiality obligations. If, as held earlier, Tevco's Agreement did not cover the metal flake technology, then Tevco was under no obligation—or, at a minimum, owed no contractual duty—to preserve the confidentiality of this technology. It follows that any information Maybelline received from Tevco relating to this technology fell within the "other source" exception to Maybelline's confidentiality obligations under its Agreement with Plaintiff. This, in the Court's view, provides still another, wholly independent ba-

---

**26.** As Maybelline notes, the apparent "public domain" nature of Plaintiff's disclosures was enhanced by Ted Jacob's occasional (and misleading) references in his correspondence to his "patents," as opposed to his patent applications. Once a patent is awarded, there is no longer any need for confidentiality or trade secret protection, because the patent law protects against unlawful misappropriation. *See Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 465 F.2d 1253, 1258 (6th Cir.1972) ("The exclusive rights conferred by a patent grant are designed not only to encourage invention, but more importantly, to disclose the invention to the public.") By claiming that he had secured patents, Jacob effectively undermined his stated intention that others should carefully safeguard the confidentiality of the information he was disclosing.

sis for concluding that the information received by Maybelline regarding Plaintiff's metal flake technology was not encompassed within the Agreement's confidentiality protections.

### 3. There Is No Evidence that Maybelline Used Plaintiff's Technology in Violation of the Parties' Confidentiality Agreement.

■ Even assuming the information and technology disclosed by Plaintiff was entitled to protection under the Confidentiality Agreement, Plaintiff's breach of contract claim against Maybelline cannot succeed absent evidence that Maybelline breached the Agreement by improperly using this information and technology.[27] The record, however, is devoid of such evidence. Instead, the evidence establishes that Maybelline's "Express Finish" formula and Plaintiff's metal flake technology are based on entirely different principles, and that Maybelline developed its formula without resort to any technology or information provided by Plaintiff.

As discussed earlier, Plaintiff's claims rest in part upon a proprietary interest it purportedly holds as to either a specialized variant of Metalure or, more broadly, any use of Metalure in nail polish formulas. As was the case with its claims against Tevco, Plaintiff's claims against Maybelline cannot succeed to the extent that they rely upon a "specialized" Metalure, because there is no evidence that Maybelline ever used this variant of Metalure in any of its products.

To the extent that Plaintiff's claims against Maybelline rest upon *any* use of Metalure, even in its publicly available form, there are several problems with this theory of liability. First, as noted with regard to the claims against Tevco, it would be difficult to establish—and the evidentiary record does not demonstrate—any causal link between Plaintiff's use of

Metalure in its formulas and any subsequent use of Metalure in another company's formula, where the subsequent use could just as well be attributable to Avery Dennison's efforts to market its own off-the-shelf product, including its public dissemination of brochures promoting the use of Metalure in "printing inks, coatings and paints." And, of course, the use of Metalure in nail polish could also have been inspired by the existing patents disclosing the use of small metal flakes in nail polish or other coatings. With respect to Maybelline, Plaintiff also must establish an additional link in this causal chain, as it was not Maybelline itself, but rather its manufacturer, Kirker Enterprises, that purchased Metalure. Nothing in the record shows that Kirker used this Metalure in manufacturing nail polish for sale by Maybelline, as opposed to another of its customers. Further, there is no evidence that Maybelline in any way suggested that its manufacturer use Metalure.

More significantly, there is no evidence that Maybelline's quick-dry nail polish formula relies upon Metalure or any other metal flake technology. To the contrary, the patent obtained by Maybelline for its fast-drying formulation lists the key ingredients as a vinyl-silicone copolymer, sold by 3M as "VS–80," and dimethicone, an anti-bubbling agent sold by Dow Corning under the name "DC–200." (Maybelline's Motion, Ex. 14.) This formula does not rely at all upon metal particles; in fact, Maybelline has marketed a particle-free clear shade of its "Express Finish" nail polish. (Graves Dep. at 276–78.) While, as Plaintiff points out, some shades of Maybelline's "Express Finish" product do include aluminum flakes, these shades evidently were developed by Maybelline's manufacturer, Kirker, and the metal flakes, with an average diameter of 50 microns, were added solely for decorative

---

27. Plaintiff apparently does not contend that Maybelline improperly disclosed Plaintiff's technology, but only that Maybelline improp-

erly used it in developing its "Express Finish" line of fast-drying nail polish.

purposes, and not to speed the drying process. (*Id.* at 70–71, 268–69, 278.) [28]

Moreover, Maybelline's and Plaintiff's formulas evidently operate under totally different principles. As noted, Ted Jacob testified that his formula dries quickly because of the "leafing" phenomenon which results from the use of small metal flakes, thereby holding the surface of the polish open and allowing the solvents to escape. Similarly, Jacob's patent application states his belief that "the aluminum flake holds open small surface areas, thereby allowing the solvents to escape before forming a film." (Plaintiff's Motion, Ex. 6, at 4.) [29] In contrast, Maybelline's formula works by quickly closing off the surface of the polish, thereby giving the surface a dry and non-tacky feeling shortly after application, while still allowing solvents to escape through the permeable, vinyl portion of the VS–80 copolymer. (*See* Graves Dep. at 41–44, 274, 276.) [30]

In an effort to rebut this evidence of distinct technologies, Plaintiff points to a preliminary expert report by Dr. Harold Zeliger, (Plaintiff's Suppl.Br., Ex. 9), and the affidavit of another expert, Dr. Maurice Siegel, (*id.*, Ex. 8). These materials, however, do nothing more than convey the opinions of these experts that Plaintiff's metal flake approach does, in their view, produce a faster-drying nail polish. [31] This is no answer to the evidence of the independent technological basis for Maybelline's formula. In particular, these opinions in no way account for the fact that some shades of Maybelline's "Express Finish" product line contain no metal flakes or particles of any sort.

Faced with all this, Plaintiff attempts yet again to transform the nature of the "technology" it disclosed to Maybelline.

28. Maybelline states that these shades incorporating metal flakes were sold for a few months in 1998, and then discontinued. Plaintiff, in turn, has produced invoices showing that Kirker began purchasing Metalure in February of 1998. (Plaintiff's Response to Maybelline's Motion, Ex. 8.) Of course, this does not necessarily indicate that Metalure was used in the nail polish manufactured by Kirker on Maybelline's behalf.

29. Maybelline's chemist, Gary Graves, has expressed his skepticism about this theory, opining that impermeable metal particles would not hold open the surface of the polish, but instead would impede the escape of solvents. (Graves Dep. at 187–88, 214.) For its part, Plaintiff has produced expert opinions that its theory is correct. (*See* Plaintiff's Motion, Ex. 10, Report by Maurice Siegel, Ph.D.; Plaintiff's Suppl.Br., Ex. 9, Opinion of Harold Zeliger, Ph.D.).

30. It is worth noting that the PTO evidently concluded, at least implicitly, that Plaintiff's and Maybelline's formulas operate under different principles. Plaintiff's patent application was rejected, in part based upon the "obviousness" of its claims in light of the prior art. In contrast, the PTO awarded a patent to Maybelline, thereby reflecting a judgment that Maybelline's formula was truly novel. *See* 35 U.S.C. § 102. The issuance of this patent gives rise to a presumption of validity. *See* 35 U.S.C. § 282.

31. The Court's review of Dr. Zeliger's report reveals some curious features. First, and rather remarkably, the report is based upon experiments "carried out by Mr. Ted Jacob," and not by Dr. Zeliger himself. (Plaintiff's Suppl.Br., Ex. 9, at 5.) Next, the report indiscriminately and interchangeably refers to "aluminum flakes," "aluminum particles," "aluminum powder," and "particulate matter" as all encompassed within Mr. Jacob's technology, despite Jacob's own testimony that his approach was based on, and limited to, the use of metal flakes of a particular shape and small size. Thus, Dr. Zeliger's discovery alternatively of "aluminum flakes," (*id.* at 5), or "aluminum particles," (*id.* at 8), in a sample of Maybelline's "Express Finish" nail polish— not surprisingly, the "Silver Aluminum" shade of this polish—does not support his conclusion that Maybelline used Jacob's technology. Finally, the report makes assertions—for example, that Jacob "invented" the addition of dimethicone to nail polish, (*id.* at 7)—that not only are contradicted by the deposition testimony provided for Dr. Zeliger's review, but also lie well outside the scope of Dr. Zeliger's expertise as a chemist. In all, this report appears to be just one more example of the great lengths to which Plaintiff (and its counsel) will go to divert attention from

In particular, Plaintiff contends that Ted Jacob was "the first" to use the DC–200 dimethicone product in his formulas. Once again, however, there are numerous evidentiary and legal flaws in this assertion. First, Plaintiff's "proof" of this "discovery" consists of the notes of Debbie Dallas, a former Tevco employee who worked with Ted Jacob, showing that certain of the formulas she prepared included the "Dow 200" product. (Plaintiff's Response to Maybelline's Motion, Ex. 12.) Plaintiff claims that these notes "show[ ] that Ted Jacob independently ... was the first to include" this product in his formulas, and that Dallas incorporated this product "at Mr. Jacob's direction." (*Id.* at 6, 7 n. 4.) Upon even cursory review, however, these notes "prove" nothing of the kind— they in no way suggest that Jacob was "the first" to use this product, nor that he "directed" Dallas to use it. To the contrary, the testimony of Dallas and several other witnesses confirms that DC–200 and other dimethicone products have been used in nail polish formulas for years, long before Ted Jacob entered the field. (*See* Dallas Dep. at 146–47, 150–51, 278; Graves Dep. at 275; Schlossman Dep. at 193–94.)

In addition, as with its broad Metalure claim, Plaintiff's claim as to DC–200 faces the substantial hurdle of establishing a proprietary interest in an off-the-shelf product marketed by a third party. Surely, no contractual agreement or trade secret protection permits Plaintiff to completely foreclose the use of this product by all others in the nail polish industry, merely by virtue of its inclusion in some of Plaintiff's formulas. Further, this theory of Plaintiff's "technology" is contradicted by Plaintiff's Complaint, which makes no mention of DC–200 or dimethicone, and instead speaks of metal flakes. Similarly,

Ted Jacob's patent application nowhere mentions DC–200, but instead rests upon an aluminum flake concept. Given all this, it is far too late in the day for Plaintiff to "reverse engineer" a claim that its "technology" encompasses an off-the-shelf and well-known ingredient found in Maybelline's quick-drying formula.

In sum, there is no evidence that Maybelline misappropriated Plaintiff's technology in developing its fast-drying nail polish formula. That being so, Maybelline is entitled to summary judgment in its favor on Plaintiff's breach of contract claim.[32]

### D. Plaintiff's Fraud Claims Against Maybelline and Tevco

In Counts II and IV of its Complaint, Plaintiff asserts fraud claims against Maybelline and Tevco, respectively, alleging that Defendants made material misrepresentations and failed to disclose material facts in connection with the execution of the Tevco Manufacturing Agreement and the Maybelline Confidentiality Agreement, and that Maybelline also made misrepresentations, following its evaluation of Plaintiff's technology, that it was not interested in pursuing this technology. Defendants argue that these fraud claims are both factually and legally unsustainable. The Court agrees.

As an initial matter, the Court's analysis of Plaintiff's breach of contract claims is largely dispositive of the fraud claims. Specifically, to the extent that Plaintiff's fraud claims rest upon the premise that Defendants made promises in their respective agreements that they did not intend to keep, the Court has found no evidence that either Defendant breached its obligations under its agreement with Plaintiff. It fol-

---

the dearth of hard evidence in support of the claims asserted in this case.

**32.** Maybelline also argues that the three-year period of confidentiality set forth in the Confidentiality Agreement provides a separate basis for awarding summary judgment in its favor. By its terms, the Agreement prohibited

Maybelline's use or disclosure of confidential information only for a three-year period, or until December 10, 1995. Because Maybelline did not begin to sell its "Express Finish" product until 1996, it argues that it cannot be held liable for any allegedly improper use of Plaintiff's technology in this product. While this contention appears on its ·face to have

lows that there is no evidentiary basis for concluding that the statements cited in support of Plaintiff's fraud claims were false. Similarly, for the reasons discussed earlier, nothing in the record supports the allegation that Maybelline misrepresented its intentions when it informed Plaintiff that it was not interested in pursuing Plaintiff's technology. Rather, all of the available evidence indicates that Maybelline did not, in fact, use Plaintiff's technology.

■ Next, to the extent that Plaintiff's fraud claims are based upon alleged discrepancies between Defendants' representations at the time of the parties' contracting and the language of the agreements themselves, such claims fail as a matter of law under the record presented here. As Defendants correctly point, a tort claim of fraud cannot be based solely on the parties' contractual relationship, but must rest upon the breach of a duty separate from the parties' contractual obligations. *See Brock v. Clinical Biotest Labs.*, 817 F.2d 24, 25–26 (6th Cir.1987); *Roehm v. Charter Mobile Home Moving Co.*, 907 F.Supp. 1110, 1113 n. 1 (W.D.Mich.1993). To be sure, there is a "fraud in the inducement" exception to this rule, where one party induces the other to enter into a contractual relationship through promises that it does not mean to keep. *See, e.g., Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 816–17 (1976). Yet, as discussed above, there is no evidence that either Defendant knowingly misrepresented its intentions at the time it contracted with Plaintiff, nor that either Defendant failed to keep the promises made in its agreement with Plaintiff.[33] Accordingly, Defendants are entitled to

summary judgment in their favor on Counts II and IV of Plaintiff's Complaint.

## E. Plaintiff's Trade Secret Claims Against Maybelline and Tevco

Count V of Plaintiff's Complaint asserts trade secret misappropriation claims against both Maybelline and Tevco. In light of the Court's analysis of Plaintiff's breach of contract claims, it is clear as a matter of law that Plaintiff cannot show any misappropriation of trade secrets. In particular, the Court already has concluded that there is no evidence as to either Defendant's improper disclosure or use of confidential information or technology provided by Plaintiff. Further, the Court has expressed its doubt as to whether Plaintiff ever disclosed information or technology that is protected under trade secret law, given the prior information in the public domain as to the use of metal flakes in nail polish, and given Plaintiff's widespread disclosure of its technology and formulas within the cosmetics industry. Absent either a protectible trade secret or the improper use of that secret, Plaintiff cannot prevail under Count V of its Complaint. *See Rothschild v. Ford Motor Co.*, 2 F.Supp.2d 941, 950 (E.D.Mich.1998); *TGC Corp., supra*, 896 F.Supp. at 757.

■ In addition, Defendants correctly argue that Plaintiff's trade secret claims are barred by the applicable statute of limitations. Under Michigan law, the period of limitation for bringing a common-law claim of trade secret misappropriation is three years. Mich.Comp.Laws § 600.5805(8); *see also Pilkington Bros., P.L.C. v. Guardian Indus. Corp.*, 230 U.S.P.Q. (BNA) 300, 1986 WL 9876, at *2 (E.D.Mich. June 9, 1986).[34] This three-

considerable merit, the Court need not reach this issue.

**33.** Moreover, as observed by the Michigan Court of Appeals in *UAW–GM Human Resource Ctr., supra*, 579 N.W.2d at 418–20, a contractual merger/integration clause, such as the one found in the Tevco agreement, makes it legally "unreasonable" to rely upon

assurances made in connection with the execution of the contract but not incorporated in the contract itself.

**34.** Similarly, to the extent that Tennessee law governs the trade secret claim against Maybelline, the relevant period of limitation is also three years. Tenn.Code Ann. § 28–3–105(1).

year period begins to run "when the plaintiff knew or reasonably should have known of [the] defendant's misappropriation," and a plaintiff has "an affirmative duty ... to exercise reasonable diligence to discover its claim." *Pilkington Bros.*, 1986 WL 9876, at *3. Further, "the misappropriation of trade secrets is not a continuing offense," but rather "occurs at the time of the improper acquisition." *Shatterproof Glass Corp. v. Guardian Glass Co.*, 322 F.Supp. 854, 869 (E.D.Mich.1970), *aff'd*, 462 F.2d 1115 (6th Cir.1972).

Plaintiff brought this suit in December of 1998. Yet, by Ted Jacob's own testimony, Plaintiff knew or reasonably should have known of Defendants' alleged misappropriations by late 1994 or early 1995. Regarding the claim against Maybelline, Plaintiff places great emphasis on the August 5, 1994 letter from Maybelline to Decorative Industries, alleging in the Complaint that this letter is proof of disclosures in violation of the Maybelline Confidentiality Agreement. (Complaint at ¶ 24.) Ted Jacob testified that he received a copy of this letter from Decorative shortly after it was sent, back in 1994 (Jacob Dep. at 205–06.) He further testified to his view in late 1994 or early 1995, or at least his suspicion, that Maybelline was misusing his technology:

A: [Maybelline] kept promoting samples; working on projects; spending great deals of time and money on the project, and not getting—finding out that my information was being disclosed, you know, other places without, you know, my—my honest feeling is I thought they were trying to make my project without me. Finding a way around my patent. They've got my patent; they can read it; there's how many chemists there smarter than me? There is people out there, maybe not smarter than me, probably not, but are out there trying to look to find a way around it. And that's my opinion. And that's exactly what they did. He said they were going to market my product. They did market my product.

Q: Was that your opinion that that's what they were doing? Was that your opinion back in the '94, '95 time frame?

A: At that time I think something was up, yeah. I think that it was—

Q: You suspected something was up?

A: I suspected something was happening at that time, yes.

Q: You kept giving them samples?

A: I would say—

MR. MYCHALOWYCH: What time frame are we talking about?

Q: '94, '95.

A: I was still giving them samples....

Q: When was the latest time that you were still giving them samples?

A: Somewhere about there; fall of '94 would be about the end of it. Maybe in '95.

Q: Maybe into early '95?

A: Yes. That would be it.

(*Id.* at 211–12.)

Regarding the misappropriation claim against Tevco, Jacob was asked at his deposition about his June 15, 1993 letter to Tevco, in which he accused Tevco of "breach[ing] ... our contract." (Maybelline's Motion, Ex. 11.) Jacob testified that this letter expressed his dissatisfaction that Tevco had "submitted ideas of mine" to another company, Pavion, for its own benefit, and that he was unhappy with Tevco at the time because "my information was going out elsewhere." (Jacob Dep. at 141–43.) He similarly testified as to his anger in August 1993 upon discovering that Tevco allegedly had disclosed information to Creative Nail Designs in California. (*Id.* at 153–55.) Finally, and more generally, Jacob testified:

Q: .... When's the first time that you believe Tevco misappropriated, if any, any of your ideas?

A: Sometime early '94, early '94, that they were working on some of those products.

Q: Okay.

A: And that would be from probably samples that were off my lab bench and things of that nature that were there. Stuff that, you know, goes missing. Or, you know, stuff always goes walking out of those places.

\* \* \* \* \* \*

Q: When's the first time you believe that anybody misappropriated anything from you in the Tevco lab, if at all?

A: '93 at some point.

Q: 1993?

A: Yeah. '93. Late '93 I would say.

(*Id.* at 511–12.)

Against all this, Plaintiff offers the affidavit of Ted Jacob, stating that he neither knew nor had reason to suspect that either Defendant had misappropriated his technology until August of 1996, when he saw Maybelline's "Express Finish" product on a drug store shelf. (Plaintiff's Response to Maybelline's Motion, Ex. 17, ¶ 4.) As Defendants point out, however, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986). This is precisely the tactic Plaintiff has employed here.

In tacit acknowledgment of this problem, Plaintiff's counsel elicited the following testimony from Ted Jacob during the third day of his deposition, which was conducted over two months after the parties' cross-motions had been fully briefed:

Q: When's the first time you noticed that Maybelline or Tevco had done something wrong or breached their agreements with you?

A: I believe when I picked up the bottle of Express Finish of Maybelline's in 1996 is when I found the first sample with true METALURE in it.

Q: Late '96?

A: Late '96, yeah. Fall of '96. Even later.

Q: Prior to that time did you have any notice that Tevco had done anything to breach its agreement with you or Rainbow Nails?

A: No. Nothing.

(Jacob 2/21/00 Dep. at 169.) This conclusory testimony, however, cannot overcome Jacob's earlier, more explicit admissions as to the specific bases for his beliefs and suspicions back in 1993, 1994, and early 1995, particularly where no attempt was made to explain the various discrepancies in Jacob's testimony and affidavit.[35] *Cf. Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir.1997) (declining to consider an affidavit, where "a reasonable jury would know" that it could not be reconciled with the plaintiff's prior, detailed deposition testimony).

Thus, regardless of what Mr. Jacob might now consider to be sufficient "notice" of Defendants' alleged misappropriations, his testimony at his initial deposition reveals that, at various points between 1993 and early 1995, he "knew of facts sufficient to excite such inquiry as would have been made in the exercise of reasonable diligence." *Pilkington Bros.*, 1986 WL 9876, at *3 (internal quotations and citation omitted). Because this is all the notice the law requires to trigger the three-year period of limitation, the Court concludes that Plaintiff's trade secret claims are time barred.

---

35. Indeed, even Jacob's affidavit and most recent deposition testimony are inconsistent. In his affidavit, he identifies August of 1996 as the time he discovered Maybelline's misuse of his technology. Yet, as noted, he testified most recently that this discovery occurred in the "[f]all of '96," or "[e]ven later."

### F. Plaintiff's Remaining Claims

Based on the foregoing, the remaining claims asserted in Plaintiff's Complaint fail as a matter of law. First, as Plaintiff concedes, its Count VI claim of breach of implied duty of good faith is dependent upon its breach of contract claims. Given the absence of evidentiary support for the breach of contract claims, it follows that Count VI also lacks evidentiary support. Next, as to Count VII, alleging a civil conspiracy, Plaintiff admits that it must identify a substantive theory of liability in support of this conspiracy claim. Plaintiff's proposed theory of trade secret misappropriation has already been determined to be unsustainable as a matter of law. Similarly, Plaintiff is not entitled to the injunctive relief sought in Count VIII, absent any viable theory of liability under which such relief could be awarded.

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that the Cosmair/Maybelline Defendants' Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Defendant Tevco's Motion for Summary Judgment of Counts III, IV, VI and VIII of Plaintiff's Complaint is GRANTED.

IT IS FURTHER ORDERED that Defendant Tevco's Motion for Summary Judgment of Counts V and VII of Plaintiff's Complaint is GRANTED.